Robert REICH, Secretary of the
United States Department of
Labor, Plaintiff,

v.

Jerry D. LANCASTER, et al., Defendant.

No. 3:89–CV–1296–P.

United States District Court,
N.D. Texas,
Dallas Division.

Sept. 18, 1993.

Jordana Wilson, U.S. Dept. of Labor, Office of the Sol. Plan Benefits Securities Div., Washington, DC, for plaintiff.

Mark Weitz, Law Office of Mark Weitz, Austin, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

This is an action brought by the Secretary of Labor pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., as amended. The Defendants remaining in the case are Jerry D. Lancaster, JDL & Associates (JDL), Diversified Consultants, Inc. (DCI), Derek Lancaster, Daron Lancaster, Aaron Lancaster, and Kenneth Poole, a trustee of the ERISA Fund at issue in this case, The Plumbers and Pipefitters' Local 454 and Local 665 Health and Welfare Fund ("the Fund").[1]

The Secretary seeks injunctive relief, restitution and compensatory damages for the Fund. As to the Defendants Jerry D. Lan-

---

1. The suit initially named all trustees of the Fund as Defendants. At the time of trial, the Secretary had settled or dismissed his claims against all trustees except Kenneth Poole.

caster, JDL & Associates, DCI and Kenneth Poole, the Secretary alleges they are liable to the Fund for breaches of fiduciary duties under 29 U.S.C. §§ 1104, 1105, 1106(b) and 1109, as parties in interest engaging in non-exempt prohibited transactions, under 29 U.S.C. § 1106(a), and as non-fiduciary knowing participants in breaches by fund fiduciaries of their duties. The government alleges that Derek, Daron and Aaron Lancaster are liable under 29 U.S.C. § 1106 as parties in interest who engaged in non-exempt prohibited transactions. The government also alleges that Derek Lancaster is liable as a non-fiduciary knowing participant in breaches of duty by fund fiduciaries, namely the Board of Trustees of the Fund.

The parties waived trial by jury, and the case was tried before the Court. This Memorandum Opinion and Order will serve as the Court's findings of fact and conclusions of law. Rule 51(a), Fed.R.Civ.P.

Jerry D. Lancaster is a licensed insurance agent in Dallas, Texas. He is the owner and Chairman of the Board of Directors of JDL & Associates. DCI is a wholly-owned subsidiary of JDL & Associates. Jerry D. Lancaster controlled both companies during the time periods relevant to this lawsuit. Defendants Derek, Daron and Aaron Lancaster are sons of Jerry D. Lancaster, and are employees, officers and directors of JDL and DCI.

The Plumbers and Pipefitters' Local 454 and Local 665 Health and Welfare Fund (the Fund) was established pursuant to a trust instrument. Among the purposes of the Fund was to provide to eligible employees and their dependents' life and medical insurance.

## I.

### Facts

Defendant Kenneth Poole was a trustee of the Fund, and in 1983, contacted Jerry Lancaster about rendering services to the Board of Trustees in connection with the insurance needs of the Fund.

Prior to May 1983, Martin E. Segal Company provided consulting services to the Fund. As of July 1, 1982, the Fund elected to become self-insured, and to insure against incurring more than $250,000.00 in claims, the Fund purchased stop-loss insurance. United of Omaha Life Insurance Co. was hired by the Fund as claims administrator, and the Fund purchased from Omaha stop-loss insurance and group term life insurance with a death benefit of $5,000.00 for eligible employees. At the time the Fund elected to self insure, it had accumulated $513,613.00 in assets. By May 31, 1983, the Fund had accumulated assets of $779,216.00.

Before May, 1993, there were complaints about the claims administration work being done by Omaha. Kenneth Poole, as Chairman of the Board of Trustees of the Fund, began looking for other options for the Fund. Poole contacted Lancaster, and based on what he had heard about him brought him to the attention of the Board of Trustees. At the first meeting of the board that Lancaster attended on May 17, 1983, the trustees voted to hire Lancaster and his companies. DCI was hired as consultant, replacing the Segal Company, and JDL was hired as claims administrator, replacing United of Omaha. At this same meeting Lancaster proposed, and the trustees approved, changing their stop loss and group term life insurance from Omaha to Life Insurance Company of the Southwest. Lancaster also proposed purchasing a $10,000 whole life insurance policy from Guaranty Income Life Ins. Co. for each member of Locals 454 and 665. The trustees approved this proposal as well. The purchase of the whole life policies required a large outlay of cash by the Fund. At the time Lancaster made this proposal to the trustees, he did not disclose what his fees or commissions were, nor did he disclose that JDL was the regional manager for Guaranty Income with an obligation to attempt to meet a production goal of at least $500,000.00 of first year life insurance premiums.

In May 1984, Lancaster proposed, and the trustee approved, the purchase of an additional $10,000.00 whole life insurance policy from Guaranty Income for each member. Together, the policies purchased from Guaranty Income in 1983 and 1984 obligated the Fund to pay almost $300,000.00 per year in premiums. As of August, 1984, by virtue of prepaying premiums for subsequent years,

the fund had spent over $700,000.00 in premiums to Guaranty Income. Of this amount, over $400,000.00 was paid to Lancaster and his companies as commissions.

By letter dated June 26, 1985, Guaranty Income canceled Jerry Lancaster's agency contract and the Regional Manager contract (Ex. 125).

On August 14, 1985, Kenneth Poole wrote Guaranty Income a letter cancelling the Funds' life insurance policies with Guaranty.

On September 1, 1985, the Fund purchased from American General individual universal life insurance policies for each member of Locals 454 and 665 with a death benefit of $25,000.00. For these policies the Fund paid premiums totalling over $211,000.00. The Defendants Derek, Daron and Aaron Lancaster and JDL received commissions totalling $146,015.00.

Thus by the end of 1985, a little over two and one-half years after Lancaster became the Fund's consultant, the Fund had spent nearly $1,000,000.00 in premiums to purchase life insurance, and Lancaster and his companies and employees had received over $550,000.00 in commissions.

## II.

### *Liability as Fiduciaries*

It is undisputed that Defendant Kenneth Poole as a member of the Board of Trustees, was a fiduciary with respect to the Fund. The Secretary contends that Jerry Lancaster, JDL & Associates, and DCI were also fiduciaries and therefore liable under §§ 404, 405, 406 and 409 of ERISA. 29 U.S.C. § 1104, 1105, 1106 and 1109.

■ Title 29, United States Code, § 1002(21)(A) provides: "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he

has any discretionary authority or discretionary responsibility in the administration of such plan."

In *American Federation of Unions v. Equitable Life Assurance Society*, 841 F.2d 658 (5th Cir.1988), the Fifth Circuit held that a claims administrator of a union health and welfare fund was a plan fiduciary under ERISA. The court held that the administrator's authority to "grant or deny claims, to manage and disburse fund assets and to maintain claim files clearly qualifies as discretionary control respecting management of a plan or its assets within the meaning of § 1002(21)(A)." Defendants argue that they are not fiduciaries in this respect because the Fund's Board of Trustees had the power to review JDL's decisions on payment of claims. That argument, however, was rejected by the Fifth Circuit in *American Federation*, stating that "the term fiduciary includes those to whom some discretionary authority has been given." *Id.* at 663. The Defendants themselves, in an effort to justify the fees charged by JDL as reasonable, take the position that JDL did more as a claims administrator than had been done by the Fund's previous claims administrator. Pursuant to the 1983 Administrative Service Agreement with the Fund, JDL was to perform administrative, actuarial, and claims processing services. (Ex. 29). A review of the 1983 Agreement and an April 4, 1983 letter from JDL & Associates reveals that the functions performed by JDL are similar to the functions of the plan administrator in the *American Federation* case. The Court, therefore, finds that JDL & Associates was a fiduciary with respect to the Fund.

■ The Court also finds that Jerry Lancaster controlled both JDL & Associates and DCI. The trustees of the Fund were dealing with Jerry Lancaster and hired him to give advice and to handle all of the Fund's health, medical and life insurance needs. JDL and DCI were the means by which Lancaster performed the services he provided to the Fund. The two companies shared the same office, shared employees, had the same telephone numbers, and were run by Jerry Lancaster and his sons. The Court, therefore, finds that for purposes of ERISA, Jerry D.

Lancaster, JDL & Associates, and DCI are one and the same and that each is a fiduciary within the meaning of § 1002(21)(A). As the Second Circuit has stated, "Neither the separate corporate status of . . . corporations, nor the general principle of limited shareholder liability afford protection where exacting obeisance to the corporate form is inconsistent with ERISA's remedial purposes. Parties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control." *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209 (2nd Cir.1987). The Court recognizes that the facts in the *Lowen* case are more egregious and on a larger scale than what occurred in this case. However, for reasons explained more fully below, the court finds that Jerry Lancaster's primary motive in dealing with the Fund was to realize as much profit as he possibly could with no real concern for the financial welfare of the Fund. It is clear to the Court that Mr. Lancaster was not acting "solely in the interest of the participants and beneficiaries" of the Fund. 29 U.S.C. § 1104(a)(1).

■ The Court also recognizes that having a desire to make profit and giving bad advice does not make one a fiduciary under ERISA. However, the term "fiduciary" is to be given a liberal construction in keeping with the remedial purpose of ERISA, and courts have "taken a broad view in deciding whether a particular service provider should be considered a fiduciary under ERISA." *American Fed. of Unions v. Equitable Life*, supra.; *Lowen v. Tower Asset Management, Inc.*, 653 F.Supp. 1542 (S.D.N.Y.1987; aff'd 829 F.2d 1209). As the district court stated in *Lowen*, "Congress' intent to give broad scope to the term 'fiduciary' is clearly set out in the legislative history of ERISA:

> The term fiduciary . . . includes persons to whom 'discretionary' duties have been delegated by named fiduciaries. While the ordinary functions of consultants and advisors to employee benefit plans . . . may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisors may because of their special expertise, in

effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

1974 U.S.Code Cong. & Admin.News 5103." at pg. 1550.

The Fund in this case was managed by a group of trustees who had no experience or expertise in insurance matters. Every recommendation made by Lancaster in regards to health and medical insurance, life insurance, and even where to invest the Fund's money (Ex. 131) was accepted by the trustees. How much the trustees relied on Lancaster becomes glaringly evident when one considers that Lancaster convinced the trustees to spend, in a little over two years, nearly $1,000,000.00 in premiums on life insurance when the Fund only had $750,000.00 in assets. Of the premiums paid by the Fund, over $550,000.00 went to Lancaster in the form of commissions. All of the fees charged by Lancaster were accepted by the trustees, apparently without question. In the first five years after Lancaster was hired, the Fund paid over $120,000.00 more in compensation to Lancaster than would have been paid to Martin Segal, the Fund's previous consultant (Ex. 222).

Based on the evidence before it, the Court finds that Jerry Lancaster, in effect, exercised discretionary authority and control over assets of the Fund, and is therefore a fiduciary within the meaning of ERISA.

### A. *Purchase of Life Insurance Policies*

■ Section 1104 of ERISA sets out the standards to which ERISA fiduciaries are held. Section 1105 provides for liability of a fiduciary for knowingly participating in a breach by another fiduciary. Section 1106 prohibits certain transactions between the Fund, fiduciaries and parties in interest.

Plaintiff contends that the purchase by Defendants of the life insurance policies from Guaranty Income in 1983 and 1984, and from American General in 1985 constitute violations of §§ 1105, 1105 and 1106 of ERISA.

Plaintiff contends that those life insurance policies were individual insurance policies. Because the Trust Instrument under which the Fund operates provides that life insurance benefits shall be provided through the purchase of group life insurance, Plaintiff contends these purchases were in contravention of the Trust Instrument and thus violated § 104(a)(1)(D). 29 U.S.C. § 1104(a)(1)(D). That section provides that a fiduciary shall discharge his duties "in accordance with the documents and instruments governing the plan ..."

Plaintiffs also contend that these purchases violated Section 1104(a)(1)(A) and (B). The government's argument centers on their contention that the purchase of individual whole life insurance policies instead of group term life insurance resulted in a much greater cost to the Fund, thus violating the "prudent man" standard of care set out in § 1104(a)(1)(B). The government also argues that because so much of the premiums paid for the life insurance policies went to Lancaster, this was a violation of § 1104(a)(1)(A). The government reasons that paying $550,000.00 in commissions to Lancaster in a little over two years cannot be considered "defraying reasonable expenses of administering the plan."

The government further contends that the purchases of these life insurance policies violated §§ 1106(a)(1)(C) and (D), and 1106(b)(1), (2) and (3). The government argues that the commissions paid to Lancaster for the purchase of the life insurance policies in issue was not reasonable compensation, and therefore, not exempt from the prohibitions of Section 1106(a). Additionally, the government argues that the commissions paid to Lancaster were not disclosed in writing to the Fund, and therefore prohibited under § 1106(b).

Finally, the government contends that the purchases of the life insurance policies violated § 1105, which provides for liability for breach of a co-fiduciary.

The Court agrees and finds that the Defendants Jerry Lancaster, JDL & Associates and DCI violated the above-stated provision of ERISA through the purchase of the life insurance policies from Guaranty Income in 1983 and 1984, and from American General in 1985.

The Defendants contend that the life insurance policies were group policies, not individual policies, and therefore in accordance with the Trust Instrument. The Defendant's evidence is that whole and universal life insurance was purchased because the trustees wanted permanent death benefits, and this could not be accomplished through term life insurance.

The Court finds, however, that the trustees' decision to buy these policies was based on the advice of Jerry Lancaster. Further, the Court finds that the advice given by Lancaster was misleading and confusing to the trustees, and was given with the intent to make as much money as possible for Lancaster.

Exhibit 45 is a good example of the confusing and misleading information given by Lancaster to the trustees. In a letter to the trustees dated May 17, 1983, Lancaster advises that the Fund should purchase a $10,-000.00 ordinary life insurance policy on the life of each member. Lancaster attached a chart to the letter which purports to show the cost of the policies and how they will build cash value. In his letter, Lancaster states that at the end of the second year, the policies will have a cash value in excess of $100,000.00 which will be shown as assets of the Fund. He further states, "The gross cash value will continue to increase each year as the premiums are paid. The guaranteed cash value each year will be carried as an asset on the financial statement of the trust." At the same time, the chart attached to the letter indicates that the second year cost of the insurance is lowered by subtracting the cash value from the annual premium. Other evidence showed that indeed was Lancaster's plan. The only way to cut the cost of the annual premiums, which are level in whole life policies, is to use the cash value. However, by spending the cash value to pay for the premiums, the Fund would not be able to show the cash values as assets of the Funds. It is clear to the Court that the trustees thought they were getting whole life insurance policies which provided a permanent

death benefit at low cost, and building up cash values all at the same time.

As testified to by Donald Grubbs, the structure of commission payments in the insurance industry makes it more profitable for insurance agents to sell whole life insurance policies rather than group term policies, and to make multiple sales. Thus, when Lancaster recommended to the trustees the purchase of additional whole life policies in 1984, and the trustees followed that advice, Lancaster was able to make first year commissions on those premiums. In August of 1985, the Fund cancelled the Guaranty Income policies. The Defendants claim that this was done because Guaranty Income would not allow the use of accumulated cash values to pay subsequent premiums, and because the Fund was having problems obtaining information needed for IRS forms from Guaranty. The court is persuaded that while the trustees may have been convinced of this by Lancaster, Lancaster's real motive was the fact that he had been terminated as Regional Manager by Guaranty Income. That JDL was Regional Manager for Guaranty Income was not disclosed to the trustees when Lancaster recommended that the Fund purchase life insurance policies from Guaranty. Lancaster simply saw another opportunity to make more first year commissions. He recommended that the Fund purchase $25,000.00 universal life insurance policies from American General. This was done by the trustees on September 1, 1985. The Fund paid over $200,000.00 in premiums, and Lancaster made over $145,000.00 in commissions.

There was testimony from Norman Duhon, of Guaranty Income that he suggested group term and universal life insurance to Lancaster in 1983 and 1984, but Lancaster refused on the basis that those types of policies did not pay enough commissions. There was also a letter from Lancaster to Duhon indicating Lancaster would be interested in universal life policies if he could receive his regular commissions.

Additionally, in 1986, the trustees allowed the American General policies to lapse because of the poor financial condition of the Fund. This resulted in a loss to the Fund of $109,000.00. Jerry Lancaster testified that he advised the trustees to not let the American General policies lapse. The Court does not find this testimony of Jerry Lancaster to be credible. The testimony from the Defendant's expert, Joseph Hawkins, was that the universal policies were so flexible that the Fund could have reduced the face amount of the policies, reduced the premium amount, or carried the policies as term policies until the Fund was able to pay for the greater benefits it desired. There is no testimony that Lancaster offered this type of advice to the trustees, or that the trustees were made aware of their options with regard to the American General policies. As a result of this, the trustees allowed these policies to lapse, and the Fund lost $109,000.00. This leads the Court to conclude that Lancaster did not have the Fund's interest at heart. When the Fund's financial condition weakened, Lancaster did not provide the kind of advice the Fund needed. There were no more high commissions to be made. By the summer of 1986, the Fund had experienced its third straight year of declining assets. A trend that began, and no doubt helped along, when Lancaster was hired by the Fund in May, 1983.

For their violations of the ERISA provisions cited above, the Court finds that Jerry Lancaster, JDL & Associates, and DCI are liable to the Fund pursuant to § 1109 of ERISA in the amounts of $551,176.00 received by the Defendants as commissions.

Additionally, the government seeks $753,983.00 for losses to the Fund as of January 31, 1993, because of the higher cost of purchasing individual whole life policies instead of group term policies. Donald Grubbs, an expert for the Plaintiff, testified that the premiums paid by the Fund for the Guaranty Income and American General policies was $955,573.00. He further testified that the Fund could have obtained the same amount of group term life insurance for $201,173.00. This represented a loss to the Fund of $754,400.00. Grubbs then subtracted from that figure, $426,506.00 which was returned to the Fund in cash values when the policies were cancelled, and added an amount representing interest which the net savings in premiums would have earned at 8% inter-

est.[2] This resulted in a net loss to the Fund of $753,983.00 through January 31, 1993. The government contends these are losses recoverable under § 1109.

The Court agrees and ORDERS that Jerry Lancaster, JDL & Associates, and DCI reimburse the Fund for those losses.

Mr. Grubbs' calculations of the cost of group term life insurance were based on a cost of fifty-eight cents per one thousand dollars of insurance coverage. The Defendants presented evidence that group term life insurance at the rate used by Grubbs was not available to the Fund in 1983 or 1984. However, the Court does not find this evidence credible. At the time the Guaranty Income and American General policies were purchased, the Fund had in effect group term coverage which cost 58¢ per $1,000.00. Grubbs also testified that group term life insurance would have been available to the Fund at that cost. Additionally, the 1983 form 5500 filed by the Fund with the IRS reports the purchase of group term life insurance from Life Insurance Company of the Southwest at a cost of 56 cents per $1,000.00.

### B. *Unreasonable Compensations*

The Secretary also seeks restitution to the Fund of excess compensation paid to Defendants. The Secretary seeks restitution in the amount of $198,751.00. This figure has several components, the largest of which is described as "premium differentials." Along with the life insurance policies described above, the Defendants purchased stop-loss and group term life insurance from several companies. Lancaster received fees and commissions on the purchase of these insurance policies. The evidence shows that Lancaster billed the Fund for higher premiums than what was being charged by the insurance companies. Lancaster would send the insurance companies the premiums they charged, and keep the difference. The testimony of Albert Cole, an expert witness for the Plaintiff, was that from 1984 through 1988. Lancaster retained $79,500.00 in "premium differentials." The second component of the excess compensation figure is the amount charged by Defendants to handle the payment of medical health claims. The claims administrator to the Fund prior to JDL was Mutual of Omaha. Omaha received compensation at the rate of 6.11% of claims paid. JDL charged the Fund 10% of claims paid, and beginning in June 1986 charged the higher of 10% of claims paid or $4,000.00 per month. Cole testified this was excessive, and calculated that from 1984 through 1989 the Fund paid $78,249.00 more to Defendants than it would have paid to Omaha. Defendants were also paid $30,553.00 in consulting fees, $3,665.00 in other fees, and received $38,941.00 in commissions from the purchase of stop-loss and group term life insurance. Cole testified that Martin Segal, the Fund's previous consultant, provided consulting services and purchased stop-loss and group term life insurance for a $6,400.00 annual fee. Segal did not charge fees nor receive commissions for the purchase of stop-loss and group term life insurance, nor did it receive "premium differentials." The additional charges by Lancaster over what Segal would have charged totaled $120,502.00 from 1984 through 1988. That figure plus the $78,-249.00 in excess compensation received by JDL for medical health claim payments total $198,751.00 that the Secretary seeks to be reimbursed to the Fund.

2. The Secretary seeks to recover interest on the losses suffered by the fund from the purchase of individual life insurance policies rather than group term life insurance. Because these losses occurred in a short period of time, and because they involved large outlays for the Fund, the Court finds that awarding prejudgment interest on those losses is proper. The Court denies the recovery of pre-judgment interest on the $120,-502.00 loss for excessive and unreasonable compensation paid by the fund and on the commissions received by the Defendants from the purchase of the Guaranty Income and American General Life Insurance policies in 1983, '84 and '85. *Whitfield v. Lindemann,* 853 F.2d 1298 (5th Cir.1988).

The $120,502.00 excessive compensation was received by Lancaster over a five-year period, and was approved by the Trustees. The Trustees knew when they hired Lancaster, that they would be paying more than they paid their previous consultant.

The $550,000.00 in commissions received by Lancaster was part of the premiums paid to Guaranty Income and American General. Interest has been awarded for the losses caused by the purchase of those policies.

The Court finds that the $120,502.00 received by Defendants for consulting fees, commissions and other fees, and premium differentials was excessive and unreasonable compensation and should be recovered by the Fund.

The Defendants maintain that the extra compensation they received was reasonable, disclosed to the Fund, and justified by the additional work they were doing. The Court finds, however, that the "premium differentials", and the commissions and fees were not disclosed to the Fund.

Defendants presented some disclosure statements which they maintain show proof of disclosure. However, these documents were all signed after the fact. The Court is persuaded these documents were made up to cover Defendants' tracks.

Jim Burson, a Department of Labor investigator, testified he interviewed Jerry Lancaster on March 30, 1987. In that interview, Lancaster told Burson he made verbal disclosure to the fund of his fees and commissions but no written disclosures. The Court finds that whatever verbal disclosures may have been made, they were not full and complete. Defendants presented evidence that of the $79,500.00 calculated by the government as premium differential, $72,000.00 was paid to Insyst, Inc. for computer and underwriting services. However, Insyst did not have a contract with the Fund and did not have a contract with Lancaster until after the Department of Labor began its investigation. The Court views this document in the same manner as the disclosure statements referred to above. These fees also were not disclosed to the Fund.

The Court, however, **DENIES** the Secretary's request for reimbursement of the $78,-249.00 received by Defendants for claims administration in excess of what would have been paid to Omaha for the same services. The trustees testified that the reason the Fund contacted Lancaster was because of dissatisfaction with Omaha's handling of claims administration. The trustees accepted Lancaster's fee of 10% of claims paid as opposed to Omaha's 6.11% fee, because they believed it would cost more money to get better services. While it is easy, with the benefit of hindsight, to see that the trustees did not make a good decision when they hired Lancaster, the Court finds that the Trustees' actions in agreeing to pay Lancaster 10% of claims paid were not unreasonable when taken.

### C.

■ The Court also finds that Jerry Lancaster, JDL and DCI are liable to the Fund for the amounts discussed in Parts II A and II B above pursuant to 29 U.S.C. § 1105. That section provides for liability of a fiduciary if he knowingly participates in a breach by a co-fiduciary, if he fails to comply with § 1104 thereby enabling a co-fiduciary to commit a breach, or by, having knowledge of a breach, he fails to make reasonable efforts to remedy the breach.

The Court further finds that Jerry Lancaster, JDL & DCI violated the provisions of 29 U.S.C. § 1106(b)(1) and (3) which prohibit certain transactions by fiduciaries. Defendants are liable to the Fund for the commissions received from the purchase of the Guaranty Income and American General whole life insurance policies, the loss caused to the Fund because of the purchase of whole life rather than group term life insurance policies, and the excess compensation received in the form of "premium differentials" and commissions and fees charged for the purchase of stop-loss and group term life insurance. These amounts are set forth above.

### III.

### *Party in Interest Liability*

■ Title 29, United States Code, § 1106(a) prohibits certain transactions between ERISA plans and parties in interest. A party in interest is defined in § 1002(14)(B) as "a person providing services" to a plan. The Court finds that Jerry Lancaster, JDL, DCI, Derek Lancaster, Daron Lancaster and Aaron Lancaster were parties in interest with respect to the Fund.

The evidence shows that Derek, Daron and Aaron Lancaster were employees of JDL/DCI and were all involved, in varying de-

grees, with providing services to the Fund. Section 1132(a)(5) of ERISA provides that the Secretary of Labor may bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter, or (B) to obtain other appropriate equitable relief (i) to redress such violation ..."

Even though not a fiduciary, a party in interest who engages in a prohibited transaction in violation of § 1106, may be liable to the Fund for those violations pursuant to § 1132(a)(5). *Nieto v. Ecker,* 845 F.2d 868 (9th Cir.1988). The relief which may be granted by a court pursuant to 1132(a)(5) against a party in interest is limited to the "appropriate equitable relief." The United States Supreme Court has recently held that "appropriate equitable relief" in the context of § 1132(a)(3) includes only those types of relief that were typically available in equity, such as injunction and restitution, but does not include compensatory damages. *Mertens v. Hewitt Associates,* —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Section 1132(a)(3) allows a civil suit to be brought by a participant, beneficiary, or fiduciary while subsection a(5) allows the Secretary to bring a civil suit. Otherwise the language of the two subsections is substantially the same.

Section 1106(a)(1) provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows, or should know that such transaction constitutes a direct or indirect—

(c) furnishing of goods, services or facilities between the plan and a party in interest;

(d) transfer to, or use by or for the benefit of, a party in interest of any assets of the plan;"

Clearly the arrangement between the Fund and the Defendant falls within the above described prohibited transactions. The Lancasters furnished services to the Fund, the Fund furnished an employee to the Defendants, and assets of the Fund were used for the benefit of Defendants. These were the commissions and fees which were paid to Defendants. Section 1108(b)(2) provides an exemption from the prohibitions of § 1106(a) where the services provided by the party in interest "are necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."

The issue of the reasonableness of the compensation paid to Defendants has been addressed above. The Court finds that the $551,176.00 received in commissions by the Defendants is unreasonable. The commissions were received by Defendants in a two year period of time, and were charged to a fund that only had a little over $750,000.00 in assets. The Court has also previously found that $120,502.00 received by Defendants in the form of "premium differentials", and commissions and fees for the purchase of stop-loss and group term life insurance was unreasonable. This was far in excess of what the previous consultant was charging the Fund. The Defendants have tried to justify the higher compensation on the basis of extra work they were doing. However, outside the area of claims administration, which these fees and commissions did not involve, the Court has not heard any credible evidence that in the area of consulting and purchasing stop-loss and group term life insurance the Defendants were doing significantly more work, or had any greater problems, than did the previous consultant. In 1984, for doing the work for which Martin Segal received $6,400.00 in 1983, Defendants received $17,975.00. In 1986, they received $34,529.00 and in 1987, $65,966.00. The Court ORDERS that the $120,502.00, along with the $551,176.00 received by Defendants in commissions for the purchase of the Guaranty Income and American General whole life insurance policies be reimbursed by the Defendants Jerry D. Lancaster, JDL & Associates and DCI to the Fund. While the evidence shows that Derek, Daron and Aaron Lancaster received commission checks for the purchase of the American General life insurance policies in 1985, the evidence also showed that those checks were endorsed to JDL and deposited in that account (Ex. 261). Therefore the Court finds that the money received by Derek, Daron and Aaron Lancaster in violation of § 1108 is to be reimbursed by JDL & Associates and Jerry D. Lancaster.

## IV.

### Statute of Limitation

 Defendants argue that Plaintiff's cause of action for the recovery of the commissions received by Lancaster for the purchase of the Guaranty Income whole life insurance policies in 1983 is barred by limitations. Section 1113 of ERISA provides that no action may be commenced after three years from when plaintiff had actual knowledge of the breach of violation, or from when a report from which the plaintiff could reasonably be expected to have obtained knowledge of a breach or violation was filed with the Secretary of Labor. The evidence shows that in 1984, Form 5500, covering the plan year 1983, was filed with the Secretary of Labor as required by ERISA. Attached to Form 5500 was a "Schedule A" which reported the 1983 purchase of life insurance from Guaranty Income. Defendant argues that, from this, Plaintiff had actual notice of the breach or violation on which they now sue. Since this suit was not filed until 1989, more than three years after the Plaintiff acquired actual knowledge, Defendant contends that portion of the suit is barred.

However, an examination of the 1983 Form 5500 and the Schedule A attachment does not reveal that a breach or violation of ERISA occurred. Schedule A simply reports that "Group Life Insurance" was purchased from Guaranty Income. The court finds that neither form 5500 nor the Schedule A attachment, standing alone, are sufficient to have given the Secretary actual knowledge of a breach or violation of ERISA. Neither could the Secretary be "reasonably expected to have obtained knowledge" of a breach or violation from these forms. Therefore the Secretary's cause of action is not barred.

The Court notes that this Schedule A reports that the Fund paid $146,878.70 in premiums for the life insurance purchased from Guaranty Income. This accurately reports the amount of first year premiums paid by the Fund. The Schedule, however, does not report that in 1983, the Fund paid almost $250,000.00 in prepaid premiums for the second and third years which resulted in a total outlay to the Fund of almost $400,000.00 in premiums to Guaranty Income. Neither does the Schedule report the correct amount of commissions paid to JDL & Associates. The report states $44,063.61 in commissions were paid to JDL. In fact, of the first year premiums, JDL received over $127,000.00 in commissions (Ex. 272). Of the total premiums paid by the Fund in 1983, for three years, JDL received over $211,000.00 in commissions. Further evidence that full and complete disclosures of commissions were not made to the Fund by Lancaster.

## V.

### Liability as Knowing Participants

 The Secretary also seeks reimbursement from Defendants Jerry D. Lancaster, JDL, DCI, and Derek Lancaster as non-fiduciaries, who knowingly participated in breaches of fiduciary duties by fiduciaries, the trustees of the Fund. The Fifth Circuit has upheld liability on this basis. *Whitfield v. Lindemann*, 853 F.2d 1298 (5th Cir.1988). However, the Supreme Court's decision in *Mertens v. Hewitt Associates*, supra, appears to cast doubt on the validity of this theory of liability. To the extent that liability as a knowing participant to a breach by a fiduciary is a valid theory of recovery, the Court finds that Defendants Jerry D. Lancaster, JDL, DCI and Derek Lancaster are liable to the Fund on that basis.

## VI.

### Injunctive Relief

 The Secretary seeks to permanently enjoin Jerry Lancaster, JDL, DCI and any corporation owned or controlled by Jerry Lancaster from serving as a fiduciary or service provider to any ERISA plan.

After listening to this case for two weeks and observing the demeanor of the witnesses, the Court is convinced that Lancaster's primary concern in working with the Fund was to make as much money as possible without any concern for the economic welfare of the Fund. The Court heard no credible evidence that the Lancasters offered advice to the Fund designed to safekeep the economic welfare of the Fund. Instead the Lancasters gave advice which resulted in the fund, which

had approximately $750,000.00 in assets in 1983, paying over $900,000.00 in life insurance premiums in two years with the Lancasters receiving over $550,000.00 of that in commissions. The Lancasters' charges for their services resulted in the Fund paying much higher fees for services than it had previously paid. Many of these fees, or at least the amount of the fees, were not disclosed to the Fund. Some were hidden charges in the form of "premium differentials" and underwriting fees. The Lancasters engaged in a course of action which resulted in a systematic draining of the Fund.

The Court, therefore, enjoins Jerry D. Lancaster, JDL & Associates, DCI or any company owned or controlled by Jerry Lancaster from serving as fiduciaries or service providers to any ERISA plan.

Kenneth Poole is also permanently enjoined from serving as an ERISA plan trustee.

The Court will enter judgment consistent with this Memorandum Opinion and Order.

**SO ORDERED.**

### JUDGMENT

On February 1, 1993, this case came on for trial before the Court. The issues having been duly considered and a decision rendered, the Court hereby **ORDERS AND ADJUDGES** that Jerry D. Lancaster and JDL Associates pay to the fund the following amounts:

1. $753,983.00 for losses incurred by the fund from the purchase of whole life insurance policies instead of group-term insurance. This amount includes $327,894.00 in losses plus $425,999.00 in pre-judgment interest calculated at eight percent (8%) per annum;

2. $551,176.00 from commissions received from the purchase of the Guaranty Income and American General life insurance policies;

3. $120,502.00 for excessive and unreasonable compensation received.

Furthermore, Defendants Jerry D. Lancaster, JDL & Associates, Diversified Consultants, Inc. and Kenneth Poole are permanently enjoined from serving as fiduciaries or service providers to any ERISA plan.

**SO ORDERED.**