**Robert B. REICH, Secretary of the United States Department of Labor,[1] Plaintiff,**

v.

**HALL HOLDING COMPANY, INC., et al., Defendants.**

**No. 1:94CV2236.**

United States District Court, N.D. Ohio, Eastern Division.

Aug. 10, 1999.

---

1. On September 23, 1997, the Department of Labor substituted Alexis M. Herman for Rob- ert B. Reich as the current Secretary of Labor and plaintiff in this action.

Glenn M. Loos, Department Of Labor, Plan Benefits Security Division, Washington, DC, for Alexis M Herman.

Anthony J. DiVenere, Sr., McDonald, Hopkins, Burke & Haber, Cleveland, OH, Edward A. Scallet, Katherine S. Kamen, LeBoeuf, Lamb, Greene & MacRae, Washington, DC, for Hall Holding Company, Inc., David L Goldman, Kathleen A Keating, Goldman Financial Group, Inc.

Thomas Jeffrey Piatak, Arter & Hadden, Cleveland, OH, Michael J. Frantz, Thompson, Hine & Flory, Cleveland, OH, for George A. Ahearn, Michael F. Shields.

## MEMORANDUM

ANN ALDRICH, District Judge.

The magistrate judge issued a report and recommendation ("R & R") on his determination of the fair market value of the Hall Holding stock purchased by the Hall ESOP on September 28, 1990, finding that the fair market value was $2,731,-174.75.

For the reasons that follow, the Court adopts that R & R (doc. # 143) in part and rejects it in part, finds that the fair market value of the stock was $2,450,451.00, declines the Secretary's invitation to impose a permanent injunction on the defendants, and closes this case. The Court also orders the defendants, jointly and severally, to pay the ESOP $1,049,549.00—the difference between the amount paid by the ESOP and the fair market value determined by this Court.

### I. Background

The facts of this case are discussed thoroughly in this Court's Orders dated January 9 and March 10, 1998, and the Court need not repeat them here. *See Reich v. Hall Holding Co., Inc.,* 990 F.Supp. 955 (N.D.Ohio 1998). After finding that the defendants violated § 406 of ERISA, this Court referred the case to the magistrate judge for preparation of an R & R concerning "the determination of the fair market value of the Hall Holding stock purchased by the Hall ESOP on September 28, 1990."

The defendants argue that the stock's value is $3.5 million; the Secretary argues that the stock's value is $918,000.

The magistrate judge essentially adopted the value proffered by the defendants, applied discounts to that value proffered by the Secretary, and arrived at a value in between what both parties wanted—$2,731,174.75. Notwithstanding that "valuation is a very inexact science", all parties object vigorously to the R & R because the magistrate judge did not unilaterally adopt their valuation.

Those objections included in part allegations that the magistrate judge improperly excluded evidence from that hearing. This Court held a two-day hearing on July 15–16, 1999 to permit the parties to present that evidence to the Court. The Court found much of that evidence irrelevant but admitted it so that the record is complete for purposes of appeal. The purpose of that hearing, however, was not to permit the parties to raise objections to the R & R that were not previously and timely made.

## II. Objections

This Court has reviewed the evidence and testimony presented both before the magistrate judge and this Court, and rules on the parties' timely objections as follows:

### A. Standard

The parties dispute the standard by which the Court determines the fair market value of the stock. The defendants allege that the fair market value of the stock is what a reasonable hypothetical fiduciary would have paid for the stock as of September 28, 1990. The Secretary alleges that the fair market value is the objective value of the stock on that date. This is a distinction without a difference.

■ In its Order of January 9, 1998, the Court held:

2. The Secretary filed a motion in limine to exclude any evidence from the defendants concerning what a reasonable hypothetical fiduciary would pay for the stock. The Court denied this motion for completeness of the

Because Hall Chemical employees earned the ESOP contributions from Hall Chemical by performing services for Hall Chemical, the employees suffered a loss if the stock purchased by the ESOP was worth less than the full value of those contributions. In other words, if the Hall Holding stock was not worth what the ESOP paid for it, the ESOP and its participants suffered a loss under ERISA § 409.

*Id.* at 961. Thus the defendants are liable to the ESOP for the loss to the ESOP under § 409, where loss is the difference between the fair market value of the stock as of September 28, 1990, and the $3.5 million paid by the ESOP for the stock. Fair market value is defined as:

The price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset.

■ Thus, the fair market value of the stock and the value of the stock as determined by a reasonable hypothetical fiduciary *looking after the interests of the ESOP* (i.e., not the defendants) should be the same. *See* Pl.Mot. In Limine (doc. # 174) at 6; *Reich v. Valley Nat'l Bank*, 837 F.Supp. 1259, 1283, 1286, 1289 (S.D.N.Y.1993) (looking at fair market value from the perspective of what a "hypothetical, non-coerced buyer would pay"; "Upon proof of fiduciary duty, Plan participants must be placed in the position they would have occupied but for the breach"; "[E]ven if Valley's breach involved nothing more than paying too high a price for the stock, Valley would still be liable for the difference between the price paid and the price that should have been paid").[2]

record and to allow the parties to present testimony concerning what methods a reasonable hypothetical fiduciary would have used to value the stock.

## B. The Percentage Used

The defendants allege that the magistrate judge should have found that the ESOP purchased 9.96%, not 9.9%, of the stock of Hall Holding. This is undisputed and the Court shall use 9.96%.

## C. Range of Values

■ As discussed elsewhere in this opinion, to arrive at his initial valuation of the stock, the defendants' valuation professional, James Cunningham, applied three valuation methodologies and obtained a range of values for each methodology. Cunningham then took an approximate average[3] of the three ranges to arrive at one valuation conclusion for the stock: $32.4–$37.4 million. GFGI officials established the value of all of the Hall Holding stock at $35 million, the mid-point of Cunningham's range. *Hall Holding*, 990 F.Supp. at 958.

The magistrate judge adopted Cunningham's valuation method and used that $35 million value prior to applying the discounts proffered by the Secretary, to arrive at an exact figure—as opposed to a range of values—for the fair market value. Notwithstanding that the magistrate judge adopted their own methodology, the defendants now allege that the magistrate judge erred in not obtaining a range of values, because valuation "is a very inexact science", and it is impossible to find an exact figure for fair market value.

To the extent, however, that the defendants interpreted that ruling as an invitation to relitigate liability, that interpretation was erroneous. In arguing that the Court should consider the evidence of a reasonable hypothetical fiduciary, the defendants cite several cases which address liability in the first instance, not loss once liability is determined. *See Herman v. Mercantile Bank*, 143 F.3d 419 (8th Cir.1998) (addressing initial liability under § 408); *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir.1983) (cited by the defendants for the proposition that the Court should not "redetermine the appropriate amount [of the stock] for itself de novo", although that passage concerned initial liability under § 408), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

Both parties also introduced evidence from witnesses other than experts or those capable

This objection is without merit. The purpose of determining the fair market value is to determine the amount of money, if any, that the ESOP lost—and the amount of money that the defendants must repay the ESOP—because of their breach of their fiduciary duties. This amount is determined by subtracting the $3.5 million that the ESOP paid for the stock from the fair market value as determined by the Court. An exact value is necessary to determine that amount.

Even if the Court were to determine a "range of values" for the stock, the Court presumes that the defendants would determine the amount of money that they must repay the ESOP by subtracting the highest "exact" value in that range from the $3.5 million paid by the ESOP, thus using an "exact" value to their advantage to repay the lowest amount possible.

The defendants' objection is unpersuasive.

However, the Court disagrees with the magistrate judge that it should take the approximate mid-point of the range as the fair market value. Instead, the Court finds that because the defendants have violated ERISA by failing to look "with a single eye" at the ESOP transaction, the Court should take the lowest value of the range to provide the ESOP members any benefit of the doubt on the valuation.

of valuing ESOPs or stock—namely, George Ahearn, Kathleen Keating, David Goldman, Michael Shields James Shumaker—apparently in an attempt to relitigate liability. The Court admitted this evidence to complete the record for purposes of appeal but did not find the majority of this evidence relevant to the issue of loss.

The defendants also filed a motion in limine to exclude rebuttal testimony concerning the hypothetical reasonable fiduciary and evidence concerning an IRS study used by Mr. Den Uyl, the Secretary's expert. The Court denied this motion primarily for completeness of the record.

**3.** The defendants contest this to a certain extent. This is discussed *infra* at pp. 760–61 of this opinion.

## D. Testimony/Qualifications

The magistrate judge heard testimony from several persons qualified to value ESOPs and/or stock: (1) Cunningham, the individual who had valued the Hall Chemical Company for the defendants, and who is a recognized expert in evaluating specialty chemical companies. He did not, however, value Hall Holding, the stock actually purchased by the ESOP. (Cunningham Dep. at 74–75); (2) Karen Brown, the defendants' expert in ESOP valuation who testified that the Cunningham valuation should be accepted unequivocally by the Court because a reasonable hypothetical fiduciary would have accepted it. Brown did not independently value the stock herself, however; and (3) Bruce Den Uyl, a valuation expert hired by the Secretary who critically reviewed the Cunningham valuation and proffered a different, lower valuation for the stock.

The Court finds that Cunningham and Den Uyl were both qualified to value the stock. Cunningham was more experienced in valuing specialty chemical companies but did not have experience in valuing ESOPs; nor did he value Hall Chemical with the ESOP issue in mind. (Tr. at 74–85; 135). Den Uyl was less experienced valuing specialty chemical companies but was more experienced in valuing ESOPs. (Tr. at 294; 300–305; 506–508; Cunningham Dep. at 43–44).[4]

Given the relative strengths and weaknesses of Cunningham and Den Uyl, the decision of the magistrate judge to adopt Cunningham's initial valuation and adjust that value to account for, as proffered by Den Uyl, both the intricacies in ESOP valuation and the fact that the ESOP purchased Hall Holding stock, not Hall Chemical, is a logical method of arriving at the fair market value.[5]

The Court finds that Brown was qualified to render an opinion on what a reasonable hypothetical fiduciary would have done in valuing the stock purchased by the ESOP. (Tr. at 176–180). However, she did not actually value the stock of either Hall Holding or Hall Chemical. (Tr. at 212). Thus her testimony, while considered by the Court, is not credited as much as that of Cunningham and Den Uyl.

## E. Methodologies

Cunningham used three valuation methods for the stock: (1) the discounted cash flow analysis; (2) the comparable companies analysis; and (3) the comparable acquisitions analysis. These are described in the R & R and need not be described here. (Tr. at 90 91; 96–97; 102–03; 196; 203;). Den Uyl agrees that these *methodologies* are appropriate for valuation of companies, although he disagrees with Cunningham's application of those methodologies to this valuation. (Tr. at 309).

Cunningham valued the entire Hall Chemical Company and concluded: (1) the range of values for Hall Chemical under the discounted cash flow analysis was $44 – $51 million; (2) the range under the comparable companies analysis was $43 – $52 million; and (3) the range under the comparable acquisitions analysis was $49 – $58 million. (DXH at 16). Cunningham then took an approximate average of the

4. Den Uyl testified that in valuing chemical companies, "it's certainly helpful understand the industry but it's not a requirement that you have spent your whole life doing it." (Tr. at 507). The Secretary therefore alleges that the magistrate judge erred in not crediting Den Uyl in full. The Court disagrees. As this Court has already stated, Den Uyl was qualified to value the company. However, as little case law exists on valuation, often the conclusion is determined in large part on the credibility and background of the witnesses who performed the valuation. Although Den Uyl performed valuations chemical companies, Tr. at 294, Cunningham had more experience with chemical companies and was named the top specialty chemical analyst several years in a row. (Tr. at 80–81). The Court agrees with the decision of the magistrate judge to find that Cunningham had more experience in chemical companies than Den Uyl.

5. For this reason, the Court finds the decision of the magistrate judge to accept Cunningham's discount rates in his discounted flow analysis to be proper.

three methods to arrive at a "valuation conclusion" range of $46 – $51 million.

### i. Erroneous Numbers Used

The Secretary alleges that Cunningham used an erroneous value of net income in his comparable companies analysis, making the adoption of his valuation erroneous. (Tr. at 710–716). Den Uyl plugged the lower net income value into Cunningham's original calculations and arrived at a corrected value of $37.6 million. The Secretary also alleges that Cunningham used an incorrect operating income for his comparable acquisitions analysis. (Tr. at 712). Den Uyl plugged the lower operating income into Cunningham's original calculations and arrived at a corrected range of values of $40.1 – $46.6 million. (Tr. at 712).

This Court does not find this argument persuasive, as the Den Uyl testimony cited by the Secretary in her brief does not contain a sufficient explanation concerning how Den Uyl arrived at these corrected values, and Cunningham testified that he used the data that was accurate to him at the time of the valuation. (Tr. at 161, 164–65; 169).

### ii. Comparability

■ The Secretary objects to Cunningham's valuation in part because she alleges that the companies used in Cunningham's comparable acquisitions analysis were not comparable. Based on Cunningham's expertise, the Court finds that the magistrate judge was correct to credit his testimony that the companies used in this analysis were comparable. (Tr. at 103; 118–19). Den Uyl's testimony to the contrary was not persuasive, as he did not appear to possess sufficient information to make such a judgment. *See* Tr. at 383–396.

The Secretary also objects to Cunningham's valuation in part because she alleges that the companies used in his comparable companies analysis were not comparable. (Tr. at 717). Cunningham used five companies in his analysis, whereas Den Uyl used only two of those companies, finding the other three not comparable. Cunning-

ham, however, testified that two companies would be inappropriate for the analysis because "the specialty chemical universe is somewhat diverse. Its [sic] frequently pretty hard to find an exact match and with two companies there would always be a *danger* of one company where there was something really very different than the other company, even though there might be some similarities. So we felt with five we would—that gave us a broad enough range where we took some averages." (Tr. at 97–98) (emphasis added).

Den Uyl's testimony supported Cunningham's concern about this danger. Den Uyl criticized Cunningham's valuation in part because the multiples Cunningham used in his comparable companies analysis were too large, as the companies used were larger than Hall Chemical. (Tr. at 351). Den Uyl testified that a size adjustment was necessary in that analysis because studies have shown that "for smaller companies you have lower multiples and for larger companies you have higher multiples". (Tr. at 352).

To support that argument, Den Uyl used a 1957 IRS study and testified that more recent studies also supported the conclusion in that study. (Tr. at 402–410; 525). The defendants attempted to impeach Den Uyl by arguing that of the two companies used by Den Uyl in the comparable companies analysis, the smaller company trades at a higher multiple. (Tr. 412). Den Uyl defended his position by stating "That's a very limited database" and "You can't reach a conclusion based on the two" because there are always outliers "to this kind of statistic"—a point with which Brown agreed. (Tr. at 412; 527; 540; 612). Den Uyl did, however, also state that there was nothing inherently incorrect with using only two companies as long as a "sanity check" was performed, which he did. (Tr. 718).

Given this testimony, the Court agrees with the decision of the magistrate judge to credit Cunningham's testimony on this point.

### F. Ahearn's 5% Share

■ Although Cunningham valued Hall Chemical, the ESOP purchased Hall Holding stock. Brown testified that this was irrelevant because, as Hall Holding's primary asset was Hall Chemical, a reasonable hypothetical fiduciary would have adopted Cunningham's valuation of Hall Chemical as the valuation of Hall Holding. The Secretary disagrees, alleging that the Cunningham valuation was too high in part because Hall Holding owned only 95% of Hall Chemical, defendant George Ahearn owning the other 5%. The magistrate judge found that insufficient evidence existed to conclude Ahearn had an interest in either Hall Chemical or Hall Holding. R & R at 9.

This Court disagrees. Den Uyl and Brown testified that Ahearn entered into a stock agreement with Hall Chemical whereby he had restricted nonvoting rights to common stock of Hall Chemical. Ahearn could not sell the stock during his term of employment, and Hall Chemical could buy back his stock at a reduced rate if he left Hall Chemical or was terminated at any time through 1993. (Tr. at 479–483; 641–42; 727).

Brown testified that although the stock had some value, the stock was restricted and therefore not worth the full 5% imputed by Den Uyl. (Tr. at 641–43). However, Den Uyl testified that the restriction only applied if Ahearn left or was terminated. Had Ahearn stayed with Hall Chemical, the stock would have been valued at a higher rate. (Tr. at 482–83; 727).

The fair market value of the Hall Holding stock purchased by the ESOP would reflect this stock at the 5% testified to by Den Uyl. In 1990, Ahearn was the president and chief operating officer of Hall Chemical. (Tr. at 257). The Court finds that a valuation professional or reasonable fiduciary would not have known at the time of the valuation whether Ahearn would leave the company or be terminated

through 1993, lessening the value of his stock.[6] Thus, the Court credits Den Uyl's testimony on this point.

### G. Marketability Discount

■ The magistrate judge applied a 5% marketability discount to the valuation to reflect that the market for a closed corporation such as Hall Holding is not as readily available as a market for publicly traded stock. The defendants object to this discount because the ESOP contained a "put" option that would allow the members of the ESOP to sell their shares back to the company. (Tr. at 70; 288; 647).

Such a discount was reasonable because to exercise this put option, an ESOP member (1) would have to wait until he or she retired from Hall Chemical; (2) might not get the cash equivalent of the stock, because the company could instead give the member a note with interest; and (3) would incur a risk, as Hall Chemical was highly leveraged and an "investor would be concerned whether [he] would be able to get paid off given the financial condition of the company". (Tr. at 340; 730). Moreover, the defendants' own expert, Brown, admitted on cross-examination that such a discount was reasonable. (Tr. at 669).

As their own expert agrees it was reasonable, the defendants' argument is unpersuasive.

### H. Minority Discount

#### (i.) Comparable Companies

■ The magistrate judge applied a minority discount of 13% to account for the fact that the ESOP purchased only a minority interest of 9.96% in Hall Holding. The defendants object to this discount for several reasons. First, they allege that the discount should not be applied to the comparable companies analysis because that analysis automatically yields a minority value for the company. (Tr. at 208–09;

---

**6.** Ahearn left Hall Chemical in 1993 and started his own company. (Tr. at 256). The actual terms on which he left Hall Chemical are disputed but wholly irrelevant to the issue of loss.

670–71). Den Uyl agrees with that argument, and the Court shall not apply the minority discount to the comparable companies analysis. (Tr. at 349).

### (ii.) Discounted Cash Flow

■ The defendants object to this discount as applied to the discounted cash flow analysis because Brown testified that Cunningham's discounted flow analysis "arrived directly at a minority value of Hall Chemical" because he did not make certain changes/"expense saves" that a controlling buyer would have made in his projections used in that analysis. (Tr. at 196; 209–10; 228; 233; 286; 644). However, Brown never valued the company herself. (Tr. at 233).

Moreover, Den Uyl testified that a minority discount was appropriate and Cunningham agreed that he would look for and apply a minority discount. (Tr. at 131; 133–37; 207; 212; 531–32; Cunningham Dep. at 46–47; 63–64; 66; 107–08). It is also undisputed that Cunningham did not undertake such an analysis because he was not told that the ESOP would be purchasing a minority interest in the stock and that he had not valued a minority interest in an ESOP before. (Tr. at 134–35; Cunningham Dep. at 47). Cunningham attempted to counter this by stating that his discounted cash flow analysis "sort of in itself is a minority value" because it is a "conservative approach". (Tr. at 124–25).

The Court agrees with the decision of the magistrate judge to credit the testimony of Den Uyl on this issue, as he had more experience than Cunningham in valuing ESOPs, and, unlike Cunningham and Brown, had actually valued Hall Holding with the minority interest in mind.

### (iii.) Comparable Acquisitions

■ The defendants also object to the decision of the magistrate judge to apply a minority discount to the comparable acquisitions analysis, as they allege Cunningham's analysis also arrived at a minority value. Specifically, they allege that Cunningham deducted $7 million from the top end of the range of values of that analysis prior to "averaging" the range of values of the three methods for his ultimate valuation conclusion. (Tr. at 196; 207; 645). In short, Brown testified that Cunningham's "acquisitions value range was higher than his ultimate mathematical conclusions. So effectively a control premium was backed out. He did not go through that actual exercise but the conclusions support that." (Tr. at 645–46).

Den Uyl testified that in the comparable acquisitions analysis, it is proper to apply a minority discount because "those are values of controlling interests in companies that people are acquiring". (Tr. at 729).

For the reasons stated in part (ii) the Court agrees with the decision of the magistrate judge to credit Den Uyl's testimony on this point.

### I. Accounts Receivable and Liabilities of Hall Holding

The defendants object because the magistrate judge subtracted from Cunningham's value $1,086,509.00 in negative accounts receivable and $534,636.00 in liabilities that he believed Hall Holding had at the time of the valuation. The defendants cite to testimony of Kathleen Keating and Ahearn and to the litigation report of Brown for the argument that making the change in stock from Hall Chemical to Hall Holding was irrelevant. (Tr. 30–31; 258–59; 284–85; DefEx. P).

In short, defendants cite testimony from two people who this Court has already found did not view this transaction " 'with an eye single to the interests of the participants and beneficiaries' as required by ERISA", and another person who admittedly was retained to discuss only Cunningham's methodologies, not whether his actual calculations were correct. *Hall Holding*, 990 F.Supp. at 964. Moreover, in the portion of Ahearn's testimony cited by the defendants, he admits that Hall Holding had "liabilities somewhere around $500,000."

As such, the defendants' argument is not persuasive.

### J. The Math

Applying these adjustments to Cunningham's valuation adopted above, the Court arrives at the following:

| Calculation | Discounted Cash Flow | Comparable Companies | Comparable Acquisitions |
|---|---|---|---|
| Cunningham Value (Millions) | $44–$51 | $43–$52 | $49–$58 |
| $13.6 Million Debt | $30.4–$37.4 | $29.4–$38.4 | $35.4–$44.4 |
| 13% Minority Discount | $26.448–$32.538 | Not Applicable | $30.798–$38.628 |

| | |
|---|---|
| Average of the three ranges | $28.882–$36.552 |
| Lowest value in the range | $28,882,000.00 |
| Value after Adjustment for negative accounts receivable and liabilities | $27,260,855.00 |
| Value after 5% Marketability Discount | $25,897,812.25 |
| Value after 5% Discount (Ahearn's Interest) | $24,602,921.64 |
| 9.96% Interest of the ESOP | $2,450,451.00 (rounding up to the nearest dollar) |

The fair market value of the stock purchased by the ESOP is $2,450,451.00.

### K. Other Issues

The defendants allege that findings of fact 8, 9, and 29 in the R & R are incorrect. The Secretary has not responded to this argument so the Court shall correct the record to reflect, as urged by the defendants, that the percentage of Hall stock to be purchased by the ESOP was made after Cunningham completed the valuation and that the actual percentage of stock purchased was recommended by legal counsel.

Finally, in reviewing the parties' deposition designations, the Court has admitted Plaintiff's Exhibit 16. However, for purposes of appeal, the Secretary should produce a copy of that exhibit that does not contain handwritten notations.

### III. Permanent Injunction

The Secretary moves the Court to enter a permanent injunction against the defendants to preclude them from acting as fiduciaries or service providers to ERISA-covered plans. The Court has discretion to enter such an injunction. 29 U.S.C. § 1132(a).

This Court previously determined that the defendants violated § 406 of ERISA because "no one was evaluating the Cunningham valuation or the final stock price 'with an eye single to the interests of the participants and beneficiaries'" of the ESOP. *Id.* at 964. Nevertheless, the Court does not find the conduct in this case to be *as egregious* as the conduct in the cases cited by the Secretary in support of her position. *See Martin v. Feilen,* 965 F.2d 660 (8th Cir.1992) (issuing permanent injunction against defendants who engaged in several transactions over several years and were "guilty of reprehensible self-dealing"), *cert. denied sub nom, Henss v. Martin,* 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *Beck v. Levering,* 947 F.2d 639 (2d Cir.1991) (issuing permanent

injunction based on facts of *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209 (2d Cir.1987) (defendants caused retirement plans to lose over $20 million by investing in numerous high-risk companies from which defendants received commissions, fees, and securities in exchange for investment banking services)), *cert. denied sub nom., Levy v. Martin,* 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992); *Reich v. Lancaster,* 843 F.Supp. 194 (N.D.Tex.1993) (entering injunction against a defendant in part because the court, after observing his demeanor, was convinced that his "primary concern in working with the Fund was to make as much money as possible without any concern for the economic welfare of the fund"), *aff'd,* 55 F.3d 1034 (5th Cir.1995).

The Court has also had the opportunity to observe at least two of the defendants. Keating and Ahearn, and does not find that they breached their fiduciary duties with the intent of personal gain. Although the Court may enter an injunction absent a finding of such intent or even absent loss to the plan, *Brock v. Robbins,* 830 F.2d 640 (7th Cir.1987), the Court declines to do so at this time. The Court trusts, however, that the defendants shall not violate ERISA in the future.

### IV. Conclusion

The Court adopts that R & R (doc. # 143) in part and rejects it in part. The Court finds that the fair market value of the stock was $2,450,451.00 and declines the Secretary's invitation to impose a permanent injunction on the defendants. The Court also orders the defendants, jointly and severally, to pay the ESOP $1,049,-549.00—the difference between the amount paid by the ESOP and the fair market value determined by this Court. This case is now closed, and this Order is final and appealable.

IT IS SO ORDERED.