55 F.3d 1034
 64 USLW 2048, 19 Employee Benefits Cas. 1505,
Pens. Plan Guide P 23910G
 Robert B. REICH, Secretary of the United States Department
of Labor, Plaintiff-Appellee,
v.
Jerry D. LANCASTER, et al., Defendants.
Jerry D. LANCASTER and Jerry D. Lancaster & Associates,
Inc., Defendants-Appellants,
v.
PLUMBERS & PIPEFITTERS LOCAL 454 HEALTH & WELFARE FUND,
Defendant-Appellee.
 No. 93-1953.
 United States Court of Appeals,
Fifth Circuit.
 June 22, 1995.
 
 1
 Anthony A. Petrocchi, Christopher M. Weil, Weil & Petrocchi, Dallas, TX, for Lancaster, et al.
 
 
 2
 Paul E. Coggins, U.S. Atty., Dallas, TX, for appellee.
 
 
 3
 Jordana W. Wilson, U.S. Dept. of Labor, Washington, DC, for Reich.
 
 
 4
 Janine M. Ames, Erin B. Ahearn, Youngdahl, Sadin & McGowan, Little Rock, AR, for Plumbers/Pipefitters.
 
 
 5
 Appeal from the United States District Court for the Northern District of Texas.
 
 
 6
 Before SMITH and BARKSDALE, Circuit Judges, and FITZWATER, District Judge.*
 
 FITZWATER, District Judge:
 
 7
 An insurance agent and his agency appeal a judgment entered following a bench trial, holding each defendant liable for over $1.425 million in restitutionary relief, and permanently enjoining them from serving as fiduciaries or service providers to any ERISA[1] plan, based on findings that they had breached various fiduciary duties and caused or engaged in prohibited transactions with respect to an ERISA employee welfare benefit plan. See Reich v. Lancaster, 843 F.Supp. 194 (N.D.Tex.1993). We affirm.
 
 
 8
 * Plaintiff-Appellee Robert Reich (the "Secretary"),[2] Secretary of the United States Department of Labor ("DOL"), brought this civil enforcement action alleging breaches of fiduciary duties imposed by 29 U.S.C. Sec. 1104, and the commission of transactions prohibited by 29 U.S.C. Sec. 1106, arising from purchases of individual permanent or whole life insurance policies by Plumbers & Pipefitters Local 454 Health & Welfare Fund (the "Fund"), a self-funded ERISA employee welfare benefit plan. The Secretary sued defendant-appellant Jerry D. Lancaster ("Lancaster"); defendant-appellant Jerry D. Lancaster and Associates, Inc. ("JDL"); Diversified Consultants, Inc. ("DCI"); Lancaster's three sons, Derek Lancaster ("Derek"), Daron Lancaster, and Aaron Lancaster; and eight Fund Trustees, including the Chairman of the Board, Kenneth Poole ("Poole").[3] The Secretary also joined the Fund as a party-defendant pursuant to Fed.R.Civ.P. 19(a) so that complete relief could be granted.
 
 
 9
 In 1983 the Fund's Board of Trustees hired Lancaster, a licensed insurance agent, and his companies to provide insurance services to the Fund. The Trustees retained DCI as a consultant to the Fund, and JDL as claims administrator. Lancaster owned all the stock in and was Chairman of the Board of Directors of JDL. DCI was JDL's wholly-owned subsidiary. Lancaster's three sons were employees, officers, and directors of JDL and DCI.
 
 
 10
 At the time the Fund entered into its relationship with Lancaster, JDL, and DCI, the Trustees approved changes in the Fund's insurance contracts. The Fund had previously obtained group term life insurance for participants and beneficiaries. Lancaster proposed, and the Trustees approved, the purchase of individual whole life insurance policies with death benefits of $10,000 from Guaranty Income Life Insurance Company ("GILICO") for each member of Local 454 under age 71. Lancaster also recommended to the Trustees, and they agreed, to prepay three years of premiums in order to qualify for a discount on second and third year premiums. By persuading the Fund to pay these premiums in advance, Lancaster and JDL became entitled to commissions of 85% of premiums paid for the first year, 55% for the second year, and 10% for the third year. JDL received total commissions of $211,000 on the purchases of the 1983 GILICO policies. The Fund paid in excess of $390,000 in premiums, which amounted to more than 50% of its assets as of May 1983, and $100,000 more than the Fund had in excess of its net desired reserves. Lancaster neither disclosed to the Trustees the amount of his fees and commissions nor revealed that JDL was regional manager for GILICO, and was obligated to attempt to meet a production goal of at least $500,000 of first year life insurance premiums.
 
 
 11
 The following year, in 1984, Lancaster proposed, with the Board's approval, the purchase from GILICO of an additional $10,000 individual whole life policy for each plan participant. This entitled JDL to commissions equal to 80% of the premiums paid the first year, 50% of premiums paid for the second, and 20% of premiums paid for the third. The Fund expended the sum of $380,000 for these policies. JDL received commissions in an amount of no less than $195,000. As a result of the 1983 and 1984 purchases, the Fund had paid $770,000 in premium payments to GILICO as of August 1984. Lancaster and his companies received $406,000 of these expenditures as commissions.
 
 
 12
 In 1985 GILICO canceled Lancaster's agency and regional manager contracts for reasons unrelated to this case. Poole thereafter canceled the Fund's life insurance policies with GILICO and requested that the cash values and unearned and prepaid 1983 and 1984 policy premiums be refunded. The Fund then purchased $25,000 death benefit individual universal life insurance policies from American General Life Insurance Company ("AGLIC") for each plan participant. The Fund paid total premiums of $211,005 for these policies. AGLIC, in turn, paid commissions to JDL and Lancaster's sons in the total amount of $145,177. On September 1, 1986 the AGLIC policies lapsed due to nonpayment of premiums. The Fund lost the sum of approximately $109,000, calculated according to what the Fund paid AGLIC in excess of the cost of term insurance.
 
 
 13
 During 1983 and 1984 Lancaster also purchased stop loss,[4] group term life, and accidental death and dismemberment insurance on behalf of the Fund. He billed the Fund a higher amount in premiums than was remitted to the insurance companies. Lancaster kept these so-called "premium differentials"--that is, the difference between what the Fund paid to Lancaster and the sums that he in turn remitted to the insurance carriers. The companies also paid Lancaster, JDL, and DCI commissions and other fees on the purchase of this insurance.
 
 
 14
 By the end of 1985, approximately two and one-half years after Lancaster became the Fund's consultant, the Fund had expended nearly $1 million in life insurance premiums, of which Lancaster and his companies and employees had received in excess of $550,000 in commissions.
 
 
 15
 The Secretary predicated the instant civil enforcement action on two aspects of these transactions that are germane to this appeal. First, he alleged that the Fund had paid excessive and unwarranted premiums in purchasing individual permanent or whole life policies, when the Fund could have obtained the same or better benefits for Fund participants and beneficiaries by obtaining other types of insurance, such as group term life insurance, at far less cost. Second, the Secretary contended that Lancaster, his sons, JDL, and DCI had received more than reasonable compensation in connection with the insurance purchases.
 
 
 16
 On the basis of these two premises, the Secretary averred that the Trustees, Lancaster, JDL, and DCI had violated Sec. 1104(a)(1)(A) by failing to discharge their duties with respect to the Fund solely in the interest of the Fund's participants and beneficiaries, for the exclusive purpose of providing plan benefits and defraying reasonable expenses of plan administration; violated Sec. 1104(a)(1)(B) by failing to discharge their duties in compliance with the ERISA prudent man standard; violated Sec. 1104(a)(1)(D) by failing to discharge their duties in accordance with the Fund's plan documents and instruments; violated Sec. 1106(a)(1)(C) by causing the Fund to engage in transactions that they knew or should have known constituted a direct or indirect furnishing of goods, services, or facilities between the Fund and JDL, DCI, Lancaster, and Lancaster's sons, who were parties in interest; and violated Sec. 1106(a)(1)(D) by causing Fund assets to be transferred to, or used by or for the benefit of, JDL, DCI, and Lancaster's sons, who were parties in interest. The Secretary also maintained that Lancaster, JDL, and DCI had dealt with Fund assets in their own interest and for their own account, in violation of Sec. 1106(b)(1); acted in a transaction involving the Fund on behalf of a party, or represented a party, whose interests were adverse to those of the Fund's participants and beneficiaries, in violation of Sec. 1106(b)(2); and received consideration for their own personal account in connection with a transaction involving Fund assets, in violation of Sec. 1106(b)(3).
 
 
 17
 The Secretary alleged that Lancaster was a fiduciary within the meaning of Sec. 1002(21)(A), and a party in interest within Sec. 1002(14)(A) and (B), because he exercised discretionary authority and control with respect to the purchase of insurance by the Fund. He averred that JDL was a party in interest within Sec. 1002(14)(B) because JDL contracted to provide administrative, consulting, actuarial, and claims services to the Fund, and was a fiduciary within the meaning of Sec. 1002(21)(A) because, through Lancaster, JDL exercised discretionary authority and control with respect to the purchase of insurance by the Fund. The Secretary contended that DCI was a party in interest within Sec. 1002(14)(B) because its corporate identity was virtually identical to JDL and it provided consulting services to the Fund. He alleged that DCI was a fiduciary within the meaning of Sec. 1002(21)(A) because, through Lancaster, DCI exercised discretionary authority and control with respect to the purchase of insurance by the Fund. The Secretary maintained that Lancaster's sons were parties in interest within Sec. 1002(14)(F) because they were Lancaster's sons, and that Derek was a party in interest as a corporate officer and shareholder of JDL and DCI.
 
 
 18
 Following a two-week bench trial, the district court held that Lancaster, JDL, and DCI had violated Secs. 1104(a)(1)(A), (B), and (D), 1106(a)(1)(C) and (D), and 1106(b)(1), (2), and (3) when they caused the Fund to purchase the life insurance policies from GILICO in 1983 and 1984, and from AGLIC in 1985. Reich, 843 F.Supp. at 199.[5] The district court found that the purchases violated Sec. 1104(a)(1)(D), which obligates a fiduciary to discharge his duties in accordance with the governing documents and instruments, because the Fund's Trust Instrument specified that life insurance benefits shall be provided through the purchase of group life insurance, id.; abridged Sec. 1104(a)(1)(B)'s prudent man standard of care because the purchase of whole life insurance resulted in much greater cost to the Fund, id.; transgressed Sec. 1104(a)(1)(A)'s reasonable expenses requirement, and Sec. 1106(a)'s prohibitions (for which Sec. 1108(b)(2) provides an exemption only for reasonable compensation) because Lancaster received excessive amounts of the premiums paid for the policies and these sums were unreasonable, id.; and breached Sec. 1106(b) because the commissions paid to Lancaster were not disclosed in writing to the Fund, id. at 199 and 202. The court also found that Lancaster, JDL, and DCI were liable pursuant to Sec. 1105 as knowing participants in a breach by a co-fiduciary, because they failed to comply with Sec. 1104 and thereby enabled a co-fiduciary to commit a breach, or, having knowledge of a breach, failed to make reasonable efforts to remedy the breach. Id.
 
 
 19
 The court rejected defendants' assertions that the policies complied with the Trust Instrument's requirement of group policies, and that the policies were acquired because the Fund's Trustees desired permanent death benefits that could not be obtained through term life insurance. Id. at 199. The trial judge found instead that the Fund had purchased the policies because Lancaster persuaded the Trustees to do so on the basis of misleading and confusing advice, and that he was motivated by a desire to maximize commissions received by his sons and the entities that he owned and controlled. Id. The judge determined that Lancaster had failed to act, as required by Sec. 1104, solely in the interest of the Fund's participants and beneficiaries, because his primary motive was to realize as much profit as he could, with no real concern for the financial welfare of the Fund. Id. at 198. The court found that Lancaster had signed disclosure statements after the fact that were fabricated to cover up defendants' tracks. Id. at 202. The trial court also determined that Lancaster had received unreasonable compensation in the form of consulting fees, commissions and other fees, and premium differentials. Id.[6]
 
 
 20
 The district court entered judgment against Lancaster and JDL, ordering them to pay the Fund the sum of $753,983.00 ($327,894.00 in losses together with the sum of $425,999.00 in prejudgment interest) for losses[7] incurred from the purchase of whole life insurance policies instead of group term life insurance; $551,176.00 for commissions received by Lancaster, JDL, DCI, and Lancaster's sons from the purchase of the GILICO and AGLIC policies; and $120,502.00 for excessive and unreasonable compensation received in the form of consulting fees, commissions, and premium differentials. Id. The court also permanently enjoined Lancaster, JDL, DCI, and Poole from serving as fiduciaries or service providers to any ERISA plan. Id.[8]
 
 
 21
 The court imposed liability for restitutionary and/or injunctive relief against these defendants on various grounds. It was undisputed that defendant Poole, the Fund's Board Chairman, was a fiduciary with respect to the Fund. Id. at 197. The court determined that JDL was liable as a fiduciary within the meaning of Sec. 1002(21)(A) because JDL, as the Fund's claims administrator, had discretionary authority and exercised functions similar to those of the plan administrator in American Fed'n of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y, 841 F.2d 658 (5th Cir.1988). Id. The district judge ruled that, for purposes of ERISA, Lancaster, JDL, and DCI were "one and the same" and that each was therefore a fiduciary within the meaning of Sec. 1002(21)(A). Id. at 197-98. Lancaster controlled both JDL and DCI. The Trustees dealt with Lancaster and hired him to give advice and handle all the Fund's health, medical, and life insurance needs. Id. at 197. "JDL and DCI were the means by which Lancaster performed the services he provided to the Fund." Id. The court grounded this finding on the fact that JDL and DCI shared the same office and employees, had the same telephone numbers, and were both run by Lancaster and his sons. Id. Finally, the district court held that Lancaster was an ERISA fiduciary because "Lancaster, in effect, exercised discretionary authority and control over assets of the Fund." Id. at 198.
 
 
 22
 The trial court also concluded that Lancaster, JDL, and DCI were liable to the Fund pursuant to ERISA Sec. 1105 as knowing participants in a breach by a co-fiduciary, because they failed to comply with Sec. 1104 and thereby enabled a co-fiduciary to commit a breach, or, having knowledge of a breach, failed to make reasonable efforts to remedy the breach. Id. at 202.
 
 
 23
 The district court found Lancaster, JDL, and DCI liable pursuant to Sec. 1132(a)(5) as parties in interest, within the meaning of Sec. 1002(14)(B), who had engaged in prohibited transactions in violation of Sec. 1106. Id. at 202-03.[9]
 
 
 24
 Lancaster and JDL[10] contend the judgment below should be reversed because the district court erred: (1) in finding that Lancaster, JDL, and DCI were fiduciaries of the Fund; (2) in finding Lancaster and JDL liable as parties in interest pursuant to Sec. 1106(a) on the basis that they received unreasonable compensation; (3) in finding that the purchase of whole life insurance from GILICO, and universal life insurance from AGLIC, violated ERISA; (4) in imposing injunctive relief against Lancaster and JDL that was neither appropriate nor equitable; (5) in finding that JDL and Lancaster were liable to the Fund as knowing nonfiduciary participants to a breach by a fiduciary;[11] and (6) in finding that the ERISA claims asserted by the Secretary and the Fund against Lancaster and JDL were not barred by limitations. The Secretary and the Fund, as appellees, urge affirmance.
 
 II
 
 25
 Defendants assert that the district court erred by holding that Lancaster, JDL, and DCI[12] were fiduciaries of the Fund.
 
 
 26
 * We address as a threshold question the standard of review to be applied. Defendants maintain that the proper standard is de novo. They urge us to follow the reasoning of the dissenting opinion in Thomas, Head & Greisen Employees Trust v. Buster, 24 F.3d 1114, 1122 (9th Cir.1994) (Ferguson, J., dissenting), cert. denied, --- U.S. ----, 115 S.Ct. 935, 130 L.Ed.2d 881 (1995). They also contend that our opinion in Schloegel v. Boswell, 994 F.2d 266, 270 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 440, 126 L.Ed.2d 374 (1993), suggests that we employed a "more lenient" standard than the clear error rule.
 
 
 27
 The Secretary contends on the basis of Thomas that the determination whether a person is a fiduciary is a mixed question of law and fact. He argues that the factual components of the inquiry--e.g., whether a person exercised authority or control in managing plan assets or served as an investment advisor--are reviewed for clear error.
 
 
 28
 Defendants' reliance upon the dissent in Thomas to support pure de novo review is misplaced. Judge Ferguson recognized in his dissenting opinion that while the legal conclusions to be drawn from the facts are assessed de novo, the historical facts that underlie the determination whether someone is an investment advisor under ERISA are reviewed for clear error. Thomas, 24 F.3d at 1122. This is essentially the standard for which the Secretary argues, and that we apply today.
 
 
 29
 We decline to read Schloegel to support pure de novo review. In Schloegel we did not explicitly address the controlling standard. We held as a matter of law, on the basis of undisputed facts, that a person was not an ERISA fiduciary within the meaning of Sec. 1002(21)(A)(i). Schloegel, 994 F.2d at 272. Similarly, we concluded as a matter of law that the individual was not an ERISA fiduciary pursuant to Sec. 1002(21)(A)(ii). Id. at 273. In doing so, we relied upon a DOL regulation as well as trial evidence that we appear to have accepted as undisputed, but that we nevertheless held was inadequate to show that the defendant rendered investment advice so as to meet the statutory definition of a fiduciary. Id. We simply had no occasion in Schloegel to determine how we should review trial court findings regarding disputed facts.
 
 
 30
 We agree with the Secretary that the issue of ERISA fiduciary status is a mixed question of fact and law. We have recognized the difficulty encountered in determining the parameters of review in cases involving mixed questions.
 
 
 31
 The question of the appropriate standard of review for mixed issues of fact and law has long bedeviled appellate courts. It is sometimes said that courts lean towards freely reviewing mixed issues of fact and law. However, in most instances where we have freely reviewed purportedly mixed issues of fact and law, the facts were undisputed and the only real issue was what legal implication should be drawn from the facts. Where factual issues were in dispute, in contrast, we have at times been willing to employ the clearly erroneous rule.
 
 
 32
 Carpenters Amended & Restated Health Benefit Fund v. Holleman Constr. Co., 751 F.2d 763, 767 n. 7 (5th Cir.1985) (citations omitted). We need not resolve afresh this potentially difficult issue,[13] however, in view of our decision in Donovan v. Mercer, 747 F.2d 304, 308 (5th Cir.1984). In Donovan we did not expressly articulate the standard that guided our review, but we evaluated the district court's ruling that the defendant was not an ERISA fiduciary by assessing its factual conclusions for clear error, and examining de novo the court's legal conclusion drawn from the facts. This is consistent with the approach we have taken in other cases involving questions of party status under a federal statute. For example, in Robicheaux v. Radcliff Material, Inc., 697 F.2d 662, 666 (5th Cir.1983), we characterized as a mixed question of law and fact whether the plaintiffs were "employees" covered by the Fair Labor Standards Act of 1938. We held that we were bound by the clear error rule of Fed.R.Civ.P. 52(a) with respect to the trial court's underlying factual findings and factual inferences. Id. We reviewed de novo the legal conclusion reached by the district court, based upon the facts and inferences, that the plaintiffs were "employees" within the meaning of the Act. Id. We therefore hold that the question whether Lancaster and JDL are ERISA fiduciaries is a mixed question of fact and law.
 
 
 33
 We will review the factual components of the district court's determination--the underlying factual findings and the inferences drawn therefrom--for clear error. Rule 52(a) provides that "[f]indings of fact ... shall not be set aside unless clearly erroneous." "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." Cupit v. McClanahan Contractors, 1 F.3d 346, 348 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1993). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "[T]his court does not find facts. Neither is it free to view the evidence differently as a matter of choice." In re Placid Oil Co., 158 B.R. 404, 412 (N.D.Tex.1993). "We are not permitted to re-weigh the evidence on appeal simply because we disagree with the choices made by the district court." E.E.O.C. v. Clear Lake Dodge, 25 F.3d 265, 270 (5th Cir.1994) (citing Anderson, 470 U.S. at 573-74, 105 S.Ct. at 1511-12). Rule 52(a) also requires that we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. The trial judge's "unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected." Endrex Exploration Co. v. Pampell, 97 B.R. 316, 323 (N.D.Tex.1989). We "should be wary of attempting to second guess the district court, which has the decided advantage of first hand experience concerning the testimony and evidence presented at trial." Nichols v. Petroleum Helicopters, Inc., 17 F.3d 119, 121 (5th Cir.1994) (quoting Graham v. Milky Way Barge, Inc., 824 F.2d 376, 388 (5th Cir.1987)).
 
 
 34
 With respect to the legal conclusions reached by the trial court on the basis of the facts so found, we will conduct a plenary review under the de novo standard, and we will accord the district court's legal analysis no deference.
 
 B
 
 35
 With the appropriate standard of review in mind, we now turn to defendants' challenge to the district court's holding that Lancaster and JDL are liable to the Secretary as fiduciaries of the Fund.
 
 
 36
 * "ERISA imposes personal liability on '[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon [ERISA] fiduciaries.' " Schloegel, 994 F.2d at 271 (quoting Sec. 1109(a)). A person is an ERISA fiduciary if, with respect to an ERISA plan:
 
 
 37
 (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 38
 29 U.S.C. Sec. 1002(21)(A). "An ERISA fiduciary includes anyone who exercises discretionary authority over the plan's management, anyone who exercises authority over the management of its assets, and anyone having discretionary authority or responsibility in the plan's administration." Pacificare Inc. v. Martin, 34 F.3d 834, 837 (9th Cir.1994) (quoting Credit Managers Ass'n v. Kennesaw Life & Acc. Ins. Co., 809 F.2d 617, 625 (9th Cir.1987)). We "give[ ] the term fiduciary a liberal construction in keeping with the remedial purpose of ERISA." American Fed'n of Unions, 841 F.2d at 662 (citing Donovan, 747 F.2d at 309); see Landry v. Air Line Pilots Ass'n Int'l AFL-CIO, 901 F.2d 404, 417 (5th Cir.), cert. denied, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990). And we apply an objective standard. Farm King Supply, Inc. Integrated Profit Sharing Plan and Trust v. Edward D. Jones & Co., 884 F.2d 288, 292 (7th Cir.1989).
 
 
 39
 The district court found that JDL was a fiduciary because, as the Fund's claims administrator, it had discretionary authority and performed functions similar to those of the plan administrator in American Fed'n of Unions. Reich, 843 F.Supp. at 197.
 
 
 40
 Anticipating its ruling that Lancaster was a fiduciary, the court also held that JDL was a fiduciary because Lancaster controlled JDL. Id. The Trustees dealt with Lancaster and hired him to give advice and handle all the Fund's health, medical, and life insurance needs. Id. "JDL and DCI were the means by which Lancaster performed the services he provided to the Fund." Id. JDL and DCI shared the same office and employees, had the same telephone numbers, and were both run by Lancaster and his sons. Id. For purposes of ERISA, Lancaster, JDL, and DCI were "one and the same" and each was therefore a fiduciary within the meaning of Sec. 1002(21)(A). Id. at 197-98.
 
 
 41
 The district court held that Lancaster was a Fund fiduciary because "Lancaster, in effect, exercised discretionary authority and control over assets of the Fund." Id. at 198. The Fund Trustees hired Lancaster to give advice and handle all of the Fund's health, medical, and life insurance needs. Id. at 197. The Fund was managed by Trustees who had no experience or expertise in insurance matters. Id. at 198. They accepted every recommendation that Lancaster made concerning health and medical insurance, life insurance, and Fund investment decisions. Id.
 
 
 42
 The challenge that defendants present to the district court's findings apparently is addressed to each subsection of Sec. 1002(21)(A). Because Sec. 1002(21)(A) establishes a disjunctive test, however, we need only determine whether the district court correctly tethered fiduciary status to any one of the subsections. We therefore pretermit an analysis of subsection (ii),[14] and determine whether the district court properly held Lancaster and JDL to be Fund fiduciaries pursuant to Sec. 1002(21)(A)(i) or (iii).
 
 
 43
 Defendants essentially urge that Lancaster was merely a consultant and salesman, and that a professional does not become a fiduciary merely by giving professional advice and seeking reliance on that advice; that Lancaster and JDL did not cause the Fund Trustees (who were responsible for the decision making and operation of the Fund) to relinquish their independent discretion; and JDL was a claims paying administrator who performed the perfunctory and ministerial duty of processing and paying claims within the parameters of plan documents, and a third-party administrator or insurance company does not become a fiduciary merely by performing ministerial duties and processing and paying claims.
 
 2
 
 44
 We consider first the district court's finding that JDL had discretionary authority and performed functions similar to those of the plan administrator in American Fed'n of Unions. The trial court referred explicitly to JDL's assertion that it did more as claims administrator than had been performed by the prior administrator, and cited the 1983 Administrative Services Agreement with the Fund, and an April 4, 1983 letter, that demonstrated the functions to be performed by JDL were similar to those of the plan administrator in American Fed'n of Unions. Reich, 843 F.Supp. at 197.
 
 
 45
 In American Fed'n of Unions we held that a plan administrator who possessed authority to grant or deny claims, to manage and disburse fund assets, and to maintain claim files, clearly had discretionary control respecting management of a plan or its assets within the meaning of Sec. 1002(21)(A) and therefore was an ERISA fiduciary. American Fed'n of Unions, 841 F.2d at 663. The contract that appointed the person as plan administrator empowered him to investigate, process, resolve, and pay claims to eligible members of the fund, to maintain claims files on fund members, to create a trust in the fund's account to facilitate disbursements of health benefits, and to maintain a check register accounting for disbursements. Id. at 662-63. We concluded that the administrator's fiduciary status was not diminished by the trustees' final authority to grant or deny claims and approve investments because the term fiduciary includes those to whom some discretionary authority has been delegated. Id. at 663.
 
 
 46
 Our evaluation of the trial record persuades us that the trial judge did not clearly err in his fact findings, and did not err in concluding as a matter of law based on the evidence before him, that JDL had sufficient discretionary authority, control, or responsibility in the management of the Fund, or discretionary authority or responsibility in the administration of the Fund, and was therefore a fiduciary. The 1983 Administrative Services Agreement and April 4, 1983 letter specified not only that JDL would provide claims services but that it would perform administrative, actuarial, and consulting services, as well. Administrative services included providing advice and assistance regarding the plan and subsequent revisions; preparing summary plan descriptions, materials distributed to participants, and relevant reports; and conferring with the Trustees on tax, insurance, and other issues that might affect the administration of the Fund. Consulting services included review of benefit plan provisions and eligibility rules; advice and recommendations regarding proposed plan changes and costs; and analysis and recommendations regarding bid specifications, insurance company proposals, and alternative funding methods. JDL had the authority and obligation to investigate, process, and approve claims, compute and determine benefits, maintain claim files, and draw checks on an account to pay plan benefits.
 
 
 47
 We recognize, of course, that "[a]n entity which assumes discretionary authority or control over plan assets will not be considered a fiduciary if that discretion is sufficiently limited by a pre-existing framework of policies, practices and procedures." Useden v. Acker, 947 F.2d 1563, 1575 (11th Cir.1991), cert. denied, --- U.S. ----, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993). A third-party administrator who merely performs ministerial duties or processes claims is not a fiduciary. Kyle Rys. v. Pacific Admin. Serv. Inc., 990 F.2d 513, 516 (9th Cir.1993). The authority to grant, deny, or review denied claims can, however, make one a fiduciary. See id. at 517-18; Pacificare, 34 F.3d at 837-38 (ERISA plan health insurer who had discretionary authority to approve or deny claims could bring action pursuant to ERISA); Tregoning v. American Community Mut. Ins. Co., 12 F.3d 79, 83 (6th Cir.1993) (employer who had sole authority under plan documents to determine the benefits to which insured person may be entitled was fiduciary; employer's authority to grant or deny claims was crucial factor that made it fiduciary within Sec. 1002(21)(A)(iii)), cert. denied, --- U.S. ----, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994). Given the breadth of JDL's discretion in the management and administration of the Fund, we do not think the district court erred in elevating JDL to the status of fiduciary, and we hold that the court's reliance upon American Fed'n of Unions was proper.
 
 3
 
 48
 We now turn to defendants' challenge to the determination that Lancaster was a fiduciary. We must decide whether the trial court erred in holding that Lancaster crossed the line from professional consultant, advisor, and insurance salesman to one who effectively exercised discretionary authority.
 
 
 49
 Not all persons who have an influential role in plan decisions are transmuted into fiduciaries. Schloegel, 994 F.2d at 271 ("Mere influence over the trustee's investment decisions, however, is not effective control over plan assets."); American Fed'n of Unions, 841 F.2d at 664 ("Simply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products."); see Pappas v. Buck Consultants, Inc., 923 F.2d 531, 535 (7th Cir.1991) (discretionary authority and control refer to actual decision making power, not the influence a professional may have over the decision made by the plan trustees). "Clearly, discretion is the benchmark for fiduciary status under ERISA." Maniace v. Commerce Bank, 40 F.3d 264, 267 (8th Cir.1994); see Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 233 (3d Cir.1994) ("The linchpin of fiduciary status under ERISA is discretion."). Yet in "some situations, an advisor's influence may become so great that it confers effective discretionary authority." Smith v. National Credit Union Admin. Bd., 36 F.3d 1077, 1082 (11th Cir.1994) (citing Useden, 947 F.2d at 1578 n. 18).
 
 
 50
 We undertake the task of reviewing fiduciary status without succumbing to the improper influence of titles and labels. Section 1002(21)(A)
 
 
 51
 provides a functional definition of a fiduciary which depends, in part, upon whether a person "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets...." The Supreme Court has held that ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan, thus expanding the universe of persons subject to fiduciary duties--and to damages--under Sec. [1109(a) ]."
 
 
 52
 Kayes v. Pacific Lumber Co., 51 F.3d 1449, 1459 (9th Cir.1995) (quoting Sec. 1002(21)(A) and Mertens v. Hewitt Assocs., --- U.S. ----, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993)); see Useden, 947 F.2d at 1574 ("[Section 1002(21)(A) ] defines a fiduciary not simply in terms of certain designated offices, but also more flexibly, with reference to the functions performed by a person[.]").
 
 
 53
 We conclude that the district court did not clearly err in its factual findings, and did not commit legal error, when it held that Lancaster exercised discretionary authority and control over the Fund's assets. The trial court found:
 
 
 54
 The Fund in this case was managed by a group of trustees who had no experience or expertise in insurance matters. Every recommendation made by Lancaster in regards to health and medical insurance, life insurance, and even where to invest the Fund's money was accepted by the trustees. How much the trustees relied on Lancaster becomes glaringly evident when one considers that Lancaster convinced the trustees to spend, in a little over two years, nearly $1,000,000.00 in premiums on life insurance when the Fund only had $750,000.00 in assets. Of the premiums paid by the Fund, over $550,000.00 went to Lancaster in the form of commissions. All of these fees charged by Lancaster were accepted by the trustees, apparently without question. In the first five years after Lancaster was hired, the Fund paid over $120,000.00 more in compensation to Lancaster than would have been paid to Martin Segal, the Fund's previous consultant.
 
 
 55
 Reich, 843 F.Supp. at 198 (citations omitted). The record supports the determination that Lancaster usurped the Trustees' independent discretion and effectively exercised authority and control over management and administration of the plan with respect to the insurance policies in question. Lancaster presented misleading information to Trustees who were unsophisticated in insurance, were dependent upon Lancaster's special expertise, and uncritically accepted his recommendations. Therefore, with respect to those portions of the plan that are relevant to Lancaster's fiduciary status,[15] the trial court permissibly found and concluded that Lancaster effectively exercised discretionary authority or control over the management of the plan's insurance assets, and exercised discretionary authority or responsibility in the plan's administration. The district court did not clearly err in finding that Lancaster was the decision maker when it came to insurance purchases and the payment of compensation to those who procured it on behalf of the Fund.
 
 
 56
 Defendants rely on our decision in Schloegel to justify reversal, but we do not think it commands this result. In Schloegel we examined the record to determine inter alia whether the defendant qualified pursuant to Sec. 1002(21)(A)(i) as a fiduciary of a profit sharing plan. Schloegel, 994 F.2d at 271. The lawsuit arose after it was determined that the plan's payment of the premiums for an ordinary life insurance policy jeopardized the plan's tax-deferred status. Id. at 268. The defendant had been the adviser to a pension plan and a group health plan as well as to the profit sharing plan. Id. at 268-69. His role with respect to the profit sharing plan was much more limited than with regard to the other plans. Id. at 269. Plaintiffs did not satisfy the "authority or control" element of subsection (i), which obligated them to demonstrate that the defendant caused the plan trustee to relinquish his independent discretion in investing the plan's funds and follow the course prescribed by the defendant. Id. at 271-72. We recognized the validity of plaintiffs' argument that a person could exercise effective control over the profit sharing plan's investments, id. at 271, but we held, on the basis of undisputed facts, that the defendant did not possess the necessary degree of control. Id. at 272. The plan trustee made the decision to purchase the insurance policies. The plan trustee solicited the advice of another consultant--not the defendant--regarding whether to use profit sharing funds to purchase the insurance, thus indicating the defendant was not usurping the trustee's investment power; and, the defendant presented his life insurance proposal to six or seven members of the bank's investment committee, but persuaded only two of them to accept his recommendation. Id. We therefore held, as a matter of law, that the defendant did not have the authority or control contemplated under subsection (i). The defendant made an investment proposal, not an investment decision. Id.[16] Schloegel is distinguishable on its facts.
 
 
 57
 We emphasize that our affirmance does not automatically transform into fiduciaries conscientious or even miscreant professionals, consultants, advisors, or sales representatives who provide necessary services to ERISA plans. This is so even if these persons render advice and play influential roles by virtue of the expertise that they possess or the capacities in which they act. Nor does our decision inexorably make fiduciaries of persons who carry out perfunctory and ministerial, albeit important, duties and responsibilities for a plan. To be fiduciaries, such persons must exercise discretionary authority and control that amounts to actual decision making power. Cf., e.g., Kyle Rys., 990 F.2d at 516 (plan administrator was not fiduciary where its functions were merely ministerial and relevant agreement required that employer make final decision concerning all discretionary questions); Useden, 947 F.2d at 1577-78 (law firm that rendered advice on various matters did not become fiduciary); Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co., 941 F.2d 561, 570-71 (7th Cir.1991) (financial consulting firm that lacked decision making authority was not fiduciary), cert. denied, 502 U.S. 1099, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992); Baxter v. C.A. Muer Corp., 941 F.2d 451, 455 (6th Cir.1991) (plan administrator who merely processed and paid claims in accordance with terms of plan was not fiduciary); Pappas, 923 F.2d at 535 (actuaries who merely gave advice to plan trustees and invited reliance on such advice did not thereby become fiduciaries); Anoka Orthopaedic Assocs., P.A. v. Lechner, 910 F.2d 514, 517 (8th Cir.1990) (attorney and accounting firm who performed ministerial tasks that did not entail discretionary authority or responsibility were not fiduciaries); Nieto v. Ecker, 845 F.2d 868, 870 (9th Cir.1988) (attorney was not fiduciary absent evidence that he exercised authority over plan other than by usual professional functions); American Fed'n of Unions, 841 F.2d at 664 (simply urging purchase of its products did not make insurance company an ERISA fiduciary with respect to those products).
 
 
 58
 The decision we affirm today is like those in which parties have been found to have stepped into the role of ERISA fiduciary. See, e.g., Martin v. Feilen, 965 F.2d 660, 669 (8th Cir.1992) (accountants who provided professional accounting services were fiduciaries of ESOP where they not only provided professional accounting services but also recommended transactions, structured deals, and provided investment advice to such an extent that they exercised effective control over the plan's assets and used their positions as corporate insiders to involve the plan in transactions in which they had a personal interest), cert. denied, --- U.S. ----, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). Two cases involving insurance agents are illustrative.
 
 
 59
 In Brink v. DaLesio, 496 F.Supp. 1350 (D.Md.1980), aff'd in relevant part, rev'd in part, 667 F.2d 420 (4th Cir.1981), the district court found an insurance agent to be a fiduciary, concluding that he exercised discretionary authority concerning the management of the funds and rendered investment advice for a fee. See id. at 1374-75. The court relied on cases that held plan administrators and consultants who effectively controlled or guided the management of plans to be fiduciaries. Id. at 1375 (citing cases). The court cited uncontradicted testimony that the insurance agent was solely responsible for formulating specifications when bids were solicited; made the initial decisions that bids would be solicited when optometric and dental services were added to the plans; decided which carriers would receive solicitations; and analyzed the bids that were received and presented his analysis to the trustees. Id. at 1374. The evidence showed that the trustees relied heavily on his advice concerning the amount of funds necessary to be maintained in the checking account. On the rare occasions when the reasonableness of the agent's compensation was discussed, the agent advised the trustees that additional work was required as the funds expanded, and used this allegedly expanding workload to justify increasing his compensation. Id. at 1374-75.
 
 
 60
 In Miller v. Lay Trucking Co., 606 F.Supp. 1326 (N.D.Ind.1985), the trial court found that an insurance agent was an ERISA fiduciary. The agent assisted the plan administrator--who the testimony of the insurance agent showed was probably unaware of his responsibilities as administrator--by giving him advice concerning the types of investments to be made, prepared documents for submission to the Pension Benefit Guaranty Corporation ("PBGC"), and prepared monthly benefit display sheets. Id. at 1334. The documents submitted to the PBGC listed the insurance agent as "plan administrator," who signed the documents in the space reserved for the administrator. Id. The insurance agent was solely responsible for formulating specifications of the proposed plan. He gave investment and other advice to the plan administrator. Id. at 1334-35. The trial court therefore found that the agent "was exercising sufficient discretionary authority and control with regard to the administration of the plan as to make him a fiduciary." Id. at 1335.
 
 
 61
 We hold that the district court's findings of fact are not clearly erroneous, and its legal conclusions drawn from the facts are not in error. We therefore uphold its determination that Lancaster was a fiduciary who could be held personally liable for ERISA violations.
 
 III
 
 62
 Lancaster and JDL next contend the district court erred in finding them liable pursuant to Sec. 1106(a) for receiving unreasonable compensation. They also argue that the court clearly erred in finding that premium differentials and commissions and fees were not disclosed to the Fund.
 
 
 63
 * 29 U.S.C. Sec. 1106(a) prohibits certain transactions by a plan fiduciary "[e]xcept as provided in section 1108." Section 1108(b)(2) specifies that the prohibitions provided in Sec. 1106 shall not apply to "[c]ontracting or making reasonable arrangements with a party in interest ... if no more than reasonable compensation is paid therefor."
 
 
 64
 The Secretary sought to recover $198,751.00 that he contended was unreasonable compensation in the form of premium differentials (premium mark-ups that Lancaster took over and above what the insurance companies charged as policy premiums); sums charged by defendants to handle payment of medical health claims (JDL initially charged the Fund 10% of claims paid and later charged the higher of 10% of claims paid or $4,000 per month); and consulting fees in the amount of $30,553.00, other fees in the sum of $3,665.00, and $38,941.00 in commissions from the purchase of stop loss and group term life insurance. The Secretary introduced evidence that Lancaster had charged the Fund $120,502.00 in excess of what the previous Fund consultant would have charged, and that JDL received $78,249.00 in excess compensation for medical health claim payments. Reich, 843 F.Supp. at 201.
 
 
 65
 The district court agreed with the Secretary in part, finding that the Fund was entitled to recover from defendants the total sum of $120,502.00 in excessive and unreasonable compensation for consulting fees, commissions and other fees, and premium differentials. Id. at 202. The court denied the Secretary's request for reimbursement of the sum of $78,249.00 received by defendants for claims administration in excess of what would have been paid by the predecessor claims administrator. Id.
 
 B
 
 66
 We review for clear error the district court's factual finding that the compensation was unreasonable and that the premium differentials, and commissions and fees, were not disclosed to the Fund.
 
 
 67
 * Lancaster and JDL argue that the district court erred in finding that the $7,500 per annum administrative fee that JDL charged was excessive. They point to testimony in the record that they contend demonstrates the fee was reasonable.[17]
 
 
 68
 In order to hold that a factual finding is clearly erroneous, we must be left with a definite and firm conviction, from our review of the entire record, that a mistake has been committed. We may not view the evidence differently as a matter of choice, or substitute our judgment for a plausible assessment by the trial judge. The Secretary offered expert testimony that supported the finding that the $7,500 per annum administrative fee was excessive. We cannot say that the district court clearly erred in crediting this evidence over that on which defendants rely.
 
 2
 
 69
 Lancaster and JDL next challenge the trial court's finding that Lancaster received the sum of $79,500 as unreasonable compensation in the form of premium differentials. Defendants appear to argue that at least some of these premiums represent fees or charges for additional work performed in the acquisition of stop loss and group term insurance coverage for the Fund, and that they were calculated on a time and expense basis. Defendants also posit that Insyst, Inc. ("Insyst")--an entity wholly unrelated to Lancaster, his companies, or family--received in excess of $73,000 of this amount as compensation for services performed by Insyst that were disclosed to, and rendered on behalf of, the Fund.
 
 
 70
 The district court did not clearly err in failing to accept defendants' assertion that the premium differentials were justified by the performance of additional work. The court found that Lancaster received fees and commissions on the purchase of the life insurance policies in question as well as on the stop loss and group term life insurance. Id. at 201. In addition, Lancaster also billed the Fund higher premiums than those charged by the insurance companies, and kept the difference. Id. The court's finding that these premium differentials were excessive and unreasonable constitutes at least an implicit rejection of defendants' assertion that the sums represented fees or charges for additional work that was reasonably and necessarily performed in the acquisition of stop loss and group life insurance coverage. Indeed, elsewhere in its opinion the trial court found that the Fund's predecessor consultant did not charge fees or receive commissions for purchasing insurance of this type, nor did it pocket premium differentials. Id. The Secretary's expert witness, as well as a representative of the previous Fund consultant, presented evidence that amply supported the finding that no fees or charges in addition to the annual consulting fee were reasonably incurred to obtain stop loss and group life insurance coverage. The trial judge did not clearly err in crediting this evidence.
 
 
 71
 The district court also properly rejected defendants' reliance upon payments to Insyst as a basis to exculpate them from liability. Defendants essentially contend that Insyst performed, at below-market cost, reasonable and necessary services of which the Fund was aware and that benefited the Fund. Defendants stress that Insyst, rather than they, received these sums. The trial court held that Insyst had no contract with the Fund, and did not have an agreement with Lancaster until after the DOL commenced its investigation. Id. at 202. The trial judge viewed that contract with a jaundiced eye, placing it in the same category as disclosure statements that "were made up to cover Defendants' tracks." Id. He also found that Insyst's fees were not disclosed to the Fund. Id. We may permissibly infer from the trial court's opinion that it rejected the Insyst-based explanation for the premium differentials as implausible--something concocted after the mark-ups were discovered. The trial court emphasized that the Fund had not agreed to pay Insyst for its services and that Insyst's fees were never disclosed to the Fund. A logical deduction from these findings is that defendants were supposed to perform the services in question for the compensation the Fund had agreed to pay them. If defendants subcontracted the work to others, they were to absorb these costs as part of their overhead, not to attempt post hoc to justify on that basis secret overcharges that had been passed along to the Fund. It is clear that the trial court made credibility choices as it analyzed the testimony and exhibits before it. As we stated in First State Ins. Co. v. Mini Togs, Inc., 841 F.2d 131, 133 (5th Cir.1988) (per curiam):
 
 
 72
 The critical evidence in this case consisted of competing testimony of witnesses. It is not the province of an appeals court to reweigh evidence or judge the credibility of witnesses. Absent clear error, the trial court's assessment of witness credibility and questions of fact should remain undisturbed by an appellate court.
 
 
 73
 The record supports the district court's analysis of Insyst's role in the case.
 
 3
 
 74
 Lancaster and JDL also contest the district court's finding that the premium differentials and commissions and fees were not disclosed to the Fund.
 
 
 75
 Defendants' assertion that the trial court clearly erred in this respect essentially rests upon a line of reasoning that asks us to reweigh the evidence and decide credibility questions differently. We decline this invitation. Defendants point to portions of the trial record that would have permitted the trial judge to reach a different result, but these fail to lead us to a definite and firm conviction that a mistake has been committed. The district court assessed the believability of the witnesses and documents as it weighed the evidence. See id. at 202. It determined that documents that appeared to show proof of disclosure were "made up to cover Defendants' tracks." Id. We cannot say that these choices by the judge who saw the witnesses first hand and whose function it was to weigh the evidence committed clear error.
 
 IV
 
 76
 We next consider defendants' assertion that the district court erred in finding that Lancaster and JDL violated various ERISA provisions[18] when Lancaster induced the Fund to purchase whole life insurance from GILICO in 1983 and 1984, and universal life insurance from AGLIC in 1985, instead of group term life insurance.
 
 
 77
 Defendants posit that the purchase of whole life insurance was consistent with the Trust agreement; that group term life insurance was not available to meet the needs of the Trust; and that the Fund's losses were not caused by the insurance product but were the result of the Trustees' allowing the policies to lapse. The district court found that the Fund purchased the individual whole life insurance based upon Lancaster's misleading and confusing advice, and that Lancaster acted with the intent to make as much money for himself as possible. Id. at 199. The court awarded the Fund the sum of $551,176.00, representing amounts received by defendants as commissions, id. at 200 and 205, and the sum of $753,983.00, calculated on the basis of the higher cost of purchasing the GILICO and AGLIC individual whole life insurance policies, net of certain offsets, id. at 200, 201, and 205.
 
 
 78
 * Defendants argue that the purchase of individual whole life insurance policies did not abridge the Fund's Trust Instrument, as amended, because the policies, although originally individual, were adapted, sold, marketed, and underwritten on a group basis and were owned by the Fund, as required by the Trust Instrument. The Secretary introduced evidence, however, showing that the policies were individual rather than group insurance. The premiums that the Fund expended were much higher than would have been paid in the case of comparable group term insurance. Defendants have not demonstrated clear error in this aspect of the district court's decision.
 
 B
 
 79
 Defendants next contend group term insurance was unavailable to meet the Trust's needs. They argue that coverage was not obtainable on a term life basis for persons who were no longer actively working, over age 65 or 69, and retirees. Additionally, the Fund could not guarantee that coverage of intended personnel would continue on a permanent basis without prohibitive costs.
 
 
 80
 This contention is essentially posited in opposition to the trial court's finding that defendants violated the prudent man standard of care prescribed by Sec. 1104(a)(1)(B). Defendants urge that the type of insurance that the Secretary asserts should have been obtained was unavailable. The trial court found that Lancaster rendered advice to the Fund based not on what was available to best meet the needs of Fund participants, but instead with the intent to make as much money as possible for himself. The court rejected the proposition that defendants acted on the basis that insurance was not available. Among its findings is the fact that Lancaster refused to purchase GILICO group and universal life insurance in 1983 and 1984 because those types of policies did not pay enough in commissions. Reich, 843 F.Supp. at 200. The trial court's assessment of the evidence, see id. at 199-200, is fully supported by the record and is not clearly erroneous.
 
 C
 
 81
 We now turn to defendants' contention that the life insurance products did not cause the losses that the Fund sustained, but that they were instead caused by the lapse of the policies, which defendants contend was not their fault.
 
 
 82
 The trial court rejected defendants' argument. Id. at 200. The court found that the Fund canceled the GILICO policies as a result of Lancaster's conduct, which was motivated by his having been terminated as GILICO's regional manager. Lancaster recommended that the Fund purchase insurance from AGLIC because this would allow him to realize lucrative first-year commissions on the sales. Id. The court found that the Fund permitted the AGLIC policies to lapse due to the Fund's poor financial condition. Id. When the Fund's financial condition weakened, Lancaster failed to render proper advice to the Fund. Id. Lancaster no longer had the incentive provided him by the prospect of making high commissions. Id.
 
 
 83
 As before, defendants' reasoning asks us to reweigh the evidence and to assess matters of witness credibility differently than did the trial court. This is not our role as an appellate court. We discern no clear error in the trial judge's relevant findings.
 
 V
 
 84
 We consider next defendants' assertion that the district court erred in imposing injunctive relief against Lancaster and JDL that was neither appropriate nor equitable.
 
 
 85
 Defendants complain that the trial court committed clear error by entering an injunction prohibiting them from serving as fiduciaries or service providers to any ERISA plan because they were not Fund fiduciaries, and because the trial court did not do likewise with respect to the Fund Trustees who were released from the lawsuit. They contend the injunction entered by the trial court completely ignores the negligence and gross misconduct on the part of the Trustees who, once freed from the litigation, testified adversely to defendants.
 
 
 86
 Defendants have not demonstrated that the injunction is based on any clearly erroneous fact findings. Aside from the assertion that they are not ERISA fiduciaries (which presents a mixed question of fact and law), they have alleged no errors of law.[19] We agree with the Second Circuit that "ERISA imposes a high standard on fiduciaries, and serious misconduct that violates statutory obligations is sufficient grounds for a permanent injunction." Beck v. Levering, 947 F.2d 639, 641 (2d Cir.1991) (per curiam), cert. denied, 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992). The district court concluded in the present case that Lancaster and JDL had committed significant violations of their ERISA fiduciary duties. The court imposed injunctive relief on the basis of factual findings that are not clearly erroneous and legal conclusions that are not in error. We therefore uphold the equitable remedy of injunction prescribed by the trial court's judgment.
 
 VI
 
 87
 Finally, Lancaster and JDL contend the district court erred when it held that neither of the applicable ERISA three-year statutes of limitations barred the Secretary's claims based on the purchases of the whole life policies.
 
 
 88
 During the relevant time frame, Sec. 1113(a)[20] prescribed a six-year limitations period that was shortened to three years in either of two instances: first, if the plaintiff had actual knowledge of a breach or violation; or second, if a report filed with the Secretary contained disclosures from which the plaintiff could reasonably have been expected to obtain knowledge of a breach or violation. The six-year period was lengthened to the date of discovery of the breach or violation in the event of fraud or concealment. See Davidson v. Cook, 567 F.Supp. 225, 234 (E.D.Va.1983), aff'd sub nom. Accardi v. McGuire, Woods and Battle, 734 F.2d 10 (4th Cir.) (table), cert. denied, 469 U.S. 899, 105 S.Ct. 275, 83 L.Ed.2d 211 (1984).
 
 
 89
 Defendants contend the Secretary had the requisite knowledge as early as October or November 1983, and no later than October 1984, that the Fund had purchased whole life insurance rather than term insurance, and that Lancaster, JDL, and others had received more than reasonable compensation in connection with the acquisition of whole life insurance. They rely upon the Fund's 1983 Form 5500 filing, including Schedule A[21] thereto. They also base their arguments on notice given to DOL in the form of summary plan descriptions and copies of the insurance policies purchased by the Fund. Defendants urge that the contents of the summary plan descriptions, policies, and Form 5500 and Schedule A, provided the Secretary with actual or constructive knowledge of the breaches or violations at issue in the present case, thus barring claims based on the purchases of whole life policies from May 17, 1983 through December 9, 1986, the period alleged in the Secretary's complaint.[22]
 
 
 90
 * We begin by determining the proper scope of defendants' argument on appeal. The district court's opinion addresses only whether the Secretary's action based upon the commissions received by Lancaster for the purchases of the GILICO policies in 1983 is time-barred. Reich, 843 F.Supp. at 204. The ruling is likewise limited in its analysis of the notice on which defendants rely, discussing only whether the content of 1983 Form 5500 and Schedule A provided actual or constructive knowledge. Id. Similarly, in his appellate brief, the Secretary has primarily if not exclusively addressed the 1983 GILICO purchases and the lack of knowledge afforded by 1983 Form 5500 and Schedule A. The brief adverts to the summary plan descriptions only to argue that if Form 5500 can be read in conjunction with the summary plan descriptions to disclose the purchase of individual whole life policies, such a purchase for a plan with more than 100 participants is not objectively imprudent or a per se ERISA violation.
 
 
 91
 At oral argument the parties' divergent views regarding the scope of defendants' limitations argument were apparent. Defendants relied on the summary plan descriptions as well as the Form 5500 and Schedule A, and posited that a favorable ruling regarding their limitations defense would affect the majority of the liability found in this case; the Secretary countered that even if we held that the 1983 GILICO purchases were time-barred, our ruling would simply reduce rather than eliminate the damages awarded to the Secretary.[23]
 
 
 92
 We find it necessary to examine the breadth of defendants' appellate argument, of course, because we will not normally consider questions raised for the first time on appeal. E.g., E.E.O.C. v. Clear Lake Dodge, 25 F.3d at 270 n. 3 ("Furthermore, this circuit has a long-standing rule that it will not consider for the first time on appeal an argument not made to the district court."). We must therefore decide whether defendants preserved in the district court their limitations arguments to the extent predicated on documents other than Form 5500 and Schedule A, and addressed to all claims based upon whole life insurance purchases during the 1983-86 time period rather than merely the 1983 GILICO policy purchases.
 
 
 93
 The district court perhaps focused upon a narrower range of arguments and supporting documentation than now presented because defendants limited their written closing argument to the issues of concealment (which would trigger the six-year limitations period), and actual notice of the facts that made up pp 10-13 of the Secretary's first amended complaint, asserting that "those allegations" were barred by Sec. 1113. In defendants' submission, consisting of 24 pages, they addressed the limitations issue in one page. Aside from contending that no evidence had been introduced to establish concealment, defendants relied only upon the content of exhibit 140--the 1983 Form 5500 and Schedule A--to argue that the Secretary had the requisite actual knowledge to commence the running of limitations.
 
 
 94
 We find an indication in the trial record, however, that the district judge desired that the submissions be somewhat truncated. Consistent with that wish, he advised counsel at the close of the evidence that he intended to consider other briefs already on file, including defendants' trial brief and their brief in support of a motion for partial summary judgment that the court had denied prior to trial. Defendants did not address their limitations defense in their trial brief. But they appear to have anticipated that they would be permitted to rely upon their earlier-filed summary judgment briefing to support their limitations defense. Defendants prefaced their written closing argument by explicitly referring to, and stating that they would not repeat, their summary judgment motion. In that motion, defendants relied on the summary plan descriptions and copies of the insurance policies purchased by the Fund, as well as the 1983 Form 5500 and Schedule A, and argued that the Secretary's claims based on purchases of whole life insurance between May 1983 and May 1986 were barred by limitations because the Secretary had actual notice. See Rec. 4:821 ("The only issue[ ] of law to be addressed by the Court is whether the factual information provided by the fund placed the Plaintiff on actual notice as a matter of law so as to trigger the running of the three year limitations period." (emphasis added)).[24]
 
 
 95
 We conclude, on the basis of the trial judge's direction that counsel abbreviate their written closing arguments in view of the briefing already on file, and the judge's express reference to the summary judgment briefing, that defendants did not waive their actual knowledge limitations arguments based upon the summary plan descriptions and copies of insurance policies, and addressed to all whole life policy purchases between 1983 and 1986. We hold that defendants may not now rely, however, upon the summary plan descriptions and enclosed policy specimens to urge that the Secretary had constructive knowledge. They waived this aspect of their argument in the trial court by not presenting it in their closing argument or raising it in the adopted summary judgment briefing.
 
 B
 
 96
 We now turn to the merits of defendants' limitations defense. The version of Sec. 1113(a)(2) applicable in the present case prescribed two separate three-year limitations periods for breach of fiduciary duty lawsuits. Subsection (a)(2)(A) applied to actual knowledge of a breach or violation. Subsection (a)(2)(B) pertained to knowledge of a breach or violation that a person could reasonably be expected to have obtained from a report filed with the Secretary pursuant to ERISA. The district court rejected defendants' limitations defense, finding that neither the 1983 Form 5500 nor Schedule A revealed a breach of fiduciary duty or violation of ERISA. Reich, 843 F.Supp. at 204. The court found that Schedule A simply reported the purchase of group life insurance from GILICO. Neither the Form nor the attached Schedule, standing alone, was sufficient to provide the Secretary with actual or constructive knowledge of an ERISA breach or violation. Id. Schedule A disclosed that the Fund had paid $146,878.70 in premiums for life insurance purchased from GILICO, which was an accurate report of first year premiums paid by the Fund, but did not report that in 1983 the Fund paid almost $250,000 in second and third year prepaid premiums, which resulted in total expenditures of almost $400,000 to GILICO for premiums. The Schedule also failed to report the correct amount of commissions paid to JDL. It stated that $44,063.61 had been paid, when the sum was in fact in excess of $127,000 for first year premiums and $211,000 when prepaid premiums are included. Id.
 
 
 97
 Defendants recognize that we review the district court's limitations defense-related factual findings for clear error. See Brock v. TIC Int'l Corp., 785 F.2d 168, 171 (7th Cir.1986) (29 U.S.C. Sec. 1113(a) case) (question when reasonable person would have known that his legal rights had been invaded, so that statute of limitations begins to run, is a factual question). They argue that the trial court clearly erred when it found no actual or constructive knowledge that was sufficient to trigger the running of limitations.
 
 
 98
 * We hold that the trial court did not clearly err in its finding that the Secretary lacked the actual knowledge required to trigger the time bar of Sec. 1113(a)(2)(A). Actual knowledge "requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." Gluck v. Unisys Corp., 960 F.2d 1168, 1177 (3d Cir.1992) (citations omitted). It is a "stringent requirement." Id. at 1176. "Section 1113 sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year limitations period." Id. The Secretary "must have had specific knowledge of the actual breach of duty upon which he sues." Brock v. Nellis, 809 F.2d 753, 755 (11th Cir.), cert. dismissed, 483 U.S. 1057, 108 S.Ct. 33, 97 L.Ed.2d 821 (1987). The district court did not clearly err in finding that the 1983 Form 5500 and Schedule A did not give the Secretary actual knowledge of an ERISA breach or violation relating to the commissions received by Lancaster for the purchase of the GILICO whole life policies in 1983. After review of the documents, we are not left with a definite and firm conviction that a mistake has been made.
 
 
 99
 Although, as we have explained above, the district court did not explicitly address defendants' limitations defense insofar as based on other documents and other alleged violations, we similarly hold that the trial court did not clearly err in failing to find actual knowledge of violations on any other relevant basis. A trial court's findings satisfy Rule 52(a) if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision. Interfirst Bank v. Lull Mfg., 778 F.2d 228, 234 (5th Cir.1985). Rule 52(a) exacts "neither a requirement of punctilious detail nor slavish tracing of claims issue by issue and witness by witness." Ratliff v. Governor's Highway Safety Program, 791 F.2d 394, 400 (5th Cir.1986). "If a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with his general holding so long as the implied finding is supported by the evidence." In re Texas Mortgage Servs. Corp., 761 F.2d 1068, 1075 n. 12 (5th Cir.1985). Where the trial court makes no direct reference to a claim but must necessarily have found a certain fact, the appellate court will imply such a finding. See Clinkenbeard v. Central Southwest Oil Corp., 526 F.2d 649, 651-52 (5th Cir.1976).
 
 
 100
 We may infer from the district court's memorandum opinion that it found that the 1983 Form 5500, Schedule A, and summary plan descriptions and policy exemplars simply did not confer upon the Secretary actual knowledge of all material facts necessary to understand that some claim existed, and specific knowledge of the actual breach of duty upon which he sued. Moreover, the record does not disclose that anyone at DOL actually read the documents prior to 1987, when the investigation of the Fund commenced. See Brock, 809 F.2d at 754 (holding Secretary did not have actual knowledge necessary to commence running of limitations). Defendants have not demonstrated that the district court committed clear error in rejecting their limitations defense based upon actual knowledge.
 
 2
 
 101
 We now consider whether there is a basis to disturb the trial court's finding that the Secretary lacked constructive knowledge.
 
 
 102
 The applicable version of Sec. 1113(a)(2)(B) shortened the six-year limitations period to three years when a "report from which [the plaintiff] could reasonably be expected to have obtained knowledge of such breach or violation [is] filed with the Secretary under this title." The controlling test is whether a reasonable person would have been alerted to a probable violation by reading the report. Fink v. National Sav. and Trust Co., 772 F.2d 951, 956-57 (D.C.Cir.1985).
 
 
 103
 The district court found an absence of constructive knowledge of a breach or violation of ERISA sufficient to trigger the running of limitations in relation to the Secretary's cause of action for recovery of the commissions received by Lancaster for the purchase of GILICO whole life policies in 1983. Reich, 843 F.Supp. at 204. We will infer from the trial court's opinion that it found 1983 Form 5500 and Schedule A inadequate to confer constructive knowledge of any breaches or violations related to the purchase of whole life insurance policies during the relevant time period. This finding is not clearly erroneous.
 
 
 104
 Defendants' constructive knowledge argument can be reduced to the following. In the Secretary's complaint, he alleges two grounds on which he seeks to holds defendants liable pursuant to various provisions of ERISA. He contends the Fund purchased whole life when it should have obtained term life, thus paying too much money; and he asserts that Lancaster, JDL, and others received more than reasonable compensation in connection with the insurance purchases. According to defendants, these facts were clearly disclosed in the 1983 Form 5500 and Schedule A, which revealed that the Fund had obtained whole life insurance from GILICO, and disclosed the coverage provided, the amount of premium paid, and the amount of commissions that JDL received; advised that the Fund had purchased two term life policies from Washington National Life Insurance Company, the coverage provided, the amount of premium paid, and the amount of commissions that Derek received; and notified the reader that the Fund had purchased one term life policy from Life Insurance Company of the Southwest, the coverage provided, the amount of premium paid, and the amount of commissions that Harold Sutton received. Defendants argue that this disclosure permitted the Secretary, with little if any analysis, to determine that the Fund was paying too much for insurance through the purchase of whole life policies, and that the Fund was paying excessive compensation.
 
 
 105
 Defendants' argument is a simple one, but we find it to be overly so. The purchase of whole life insurance by an employee welfare benefit plan is not a per se violation of ERISA. The fact that the 1983 report disclosed such an acquisition would not, of itself, have any peculiar reason to perk the antennae of a reasonable person. The information imparted by a disclosure, and whether it would alert a reasonable person to a probable violation, is a matter of degree. It is obviously something less than that which conveys actual knowledge; otherwise, Sec. 1113(a)(2)(A) would be superfluous. And it is necessarily more than that which would confer knowledge upon the extraordinary person, or the test would not be formulated on the basis of a reasonable person. See Brock, 785 F.2d at 171 (test is what would alert a reasonable person, not an extraordinary person). The district court in effect examines the evidence on an alertness continuum, deciding on the basis of the facts before it whether a reasonable person would have been notified of a probable violation of ERISA.
 
 
 106
 What makes the purchase of this type of insurance violative of the prudent man standard is the substantial difference in cost for insubstantial differences in benefits. Assuming the report made pellucid that the Fund had purchased whole life insurance that was more expensive than term life, the notice must still have been sufficiently clear to notify a reasonable person of a probable violation. This would not occur in an analytical vacuum, but would likely require a careful comparison of what was purchased with what was available. An individual attempting to assess the products in relation to each other would probably need information regarding basic underwriting considerations to know what insurance was obtainable by the Fund.[25] A reasonable person would presumably require data on the specific benefits of the competing insurance products. In fact, in exhibit 45 Lancaster attempted to persuade the Fund's Trustees to purchase $10,000 ordinary life insurance policies from GILICO by citing high cash values to create a low average annual cost, and the ability of the Fund to reflect policy cash values as Fund assets on its financial statement. Because comparative assessments of this type would have to be made, and inferences would need to be drawn from the data, before the purchase of whole life insurance would notify a reasonable person of a likely ERISA violation, we cannot say that the district court clearly erred in its implicit finding that such a person would not have been alerted to a probable violation simply by reading the 1983 Form 5500 and Schedule A.
 
 
 107
 Defendants make much of the district court's failure to address trial testimony by one of the Secretary's expert witnesses, Donald Grubbs ("Grubbs"), to the effect that he recognized the impropriety of purchasing whole life immediately upon seeing Form 5500 and Schedule A. We reiterate that constructive knowledge is measured according to the reasonable person, not an extraordinary person. Brock, 785 F.2d at 171. The evidence adduced at trial amply demonstrates that Grubbs knew at once that the purchase of whole life insurance for a group as large as the one at issue was imprudent because of his extensive and special experience and expertise, not because the forms told him so. Grubbs had the background of an extraordinary person who recognized the need, and knew how, to draw inferences and make comparisons that permit accurate comparability assessments of life insurance products. As a consulting actuary, he had "gone through [the] exercise enough times" with his clients, and had seen the calculations on sufficient occasions, to know what the results would be. ERISA's constructive knowledge limitations bar is not tied to what a consulting actuary with extensive experience would know. We discern no clear error in the trial court's decision not to credit defendants' arguments based upon Grubbs' knowledge.
 
 
 108
 Defendants have failed to persuade us that the trial court clearly erred in rejecting their limitations defense.
 
 
 109
 * * *
 
 
 110
 We have carefully considered the arguments presented and conclude there is no basis to disturb the district court's judgment. Accordingly, the judgment is
 
 
 111
 AFFIRMED.
 
 
 
 *
 District Judge of the Northern District of Texas, sitting by designation
 
 
 [1]
 Employee Retirement Income Security Act of 1974, 29 U.S.C. Secs. 1001-1461
 
 
 [2]
 The case was initiated by a predecessor of the current Secretary of Labor, who was substituted as a plaintiff prior to trial pursuant to Fed.R.Civ.P. 25(d)(1)
 
 
 [3]
 The Secretary either dismissed his claims against, or entered into consent orders with, all Trustees except Poole
 
 
 [4]
 Stop loss insurance is acquired by a self-insurer to protect against excessive claims. A stop loss insurer reimburses a self-insured for all or an agreed upon portion of actual claims that exceed an amount preset by the insurer and self-insured
 
 
 [5]
 The trial court referred in its opinion to a single ERISA violation, holding that Lancaster, JDL, and DCI had "violated the above-stated provision of ERISA." Id. (emphasis added). We think this is likely an inadvertence given the analysis set forth in the balance of the opinion and the court's failure to reject explicitly any of these theories. Cf. id. at 202 (expressly denying in part Secretary's unreasonable compensation claim). Accordingly, with respect to the defendants against whom relief was granted, we will treat the district court's opinion as having found all the violations alleged and recited in its opinion, with the exception of the portion of one claim that the court affirmatively denied
 
 
 [6]
 The district court rejected the Secretary's assertion that the claim administration fees were excessive and unreasonable, holding the fees were disclosed to the Fund's Trustees. Id
 
 
 [7]
 Losses represent the amount the Fund would have realized if, instead of purchasing individual permanent life insurance policies, the Trustees had obtained group term life insurance and collected 8% interest on the net savings in premiums. Id. at 200-01
 
 
 [8]
 The court did not hold Lancaster's sons liable. Although they had received commission checks for the purchase of the AGLIC policies in 1985, they had endorsed these checks to JDL and they were deposited in JDL's account. Id. at 203. The district court therefore ordered Lancaster and JDL to reimburse the Fund. Id. The court imposed only injunctive relief against DCI and Poole. Id. at 205
 
 
 [9]
 The court also held that "[t]o the extent that liability as a knowing participant to a breach by a fiduciary is a valid theory of recovery" following the Supreme Court's decision in Mertens v. Hewitt Assocs., --- U.S. ----, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), Lancaster, JDL, DCI, and Lancaster's son, Derek, were liable to the Fund on this basis. Id. at 204. It is unclear, however, that the court invoked this ground in entering its judgment. For example, it did not grant any relief against Derek, see id. at 205, which it presumably would have done had it intended this conclusion to have effect. We find it unnecessary, in any event, to address this part of the trial court's decision. The court held Lancaster and JDL liable on other grounds that we affirm today, DCI is not a party to this appeal, see infra at n. 10, and the district court did not impose liability against Derek
 
 
 [10]
 Defendant DCI originally filed a notice of appeal, but later moved to withdraw the appeal, and the clerk dismissed it
 
 
 [11]
 We need not address this issue. See supra at n. 9
 
 
 [12]
 Because DCI is no longer a party to this appeal, see supra at n. 10, we are uncertain why Lancaster and JDL contest the district court's rulings with respect to DCI unless they do so because the Secretary alleged, and the trial court found, that Lancaster, JDL, and DCI were "one and the same." We will refer only to defendants-appellants Lancaster and JDL and their arguments unless specific reference to DCI is otherwise required
 
 
 [13]
 See, e.g., 1 Steven Alan Childress & Martha S. Davis, Federal Standards of Review Sec. 2.18 (2d ed. 1992)
 
 
 [14]
 Defendants argue in their brief that JDL and Lancaster did not meet the definition of fiduciary set out in Sec. 1002(21)(A)(ii) because they did not provide investment advice for a fee on a regular basis
 
 
 [15]
 See American Fed'n of Unions, 841 F.2d at 662 ("A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control."); Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc., 793 F.2d 1456, 1459-60 (5th Cir.1986), cert. denied, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 and 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987); accord Klosterman v. Western General Mgmt., Inc., 32 F.3d 1119, 1122 (7th Cir.1994); Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1188 (7th Cir.1994)
 
 
 [16]
 We also addressed in Schloegel the question whether the defendant qualified as a fiduciary pursuant to subsection (ii). Id. at 272. Because we do not rest our decision today on this component of Sec. 1002(21)(A), we do not discuss that aspect of Schloegel
 
 
 [17]
 They also devote a considerable portion of their argument to justifying the 10% claims administration fee charged, yet recognize that the district court agreed with their position. Because the district court did not impose liability on the basis of this fee, see id. at 202, we need not address this aspect of defendants' analysis
 
 
 [18]
 See supra at n. 5
 
 
 [19]
 We have already held above that defendants are ERISA fiduciaries. We need not revisit this question
 
 
 [20]
 In the form applicable to the present case, Sec. 1113(a) provided:
 No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
 (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
 (2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this title;
 except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.
 29 U.S.C. Sec. 1113 was amended in 1987 to eliminate the constructive knowledge provision of Sec. 1113(a)(2)(B). See Omnibus Budget Reconciliation Act, Pub.L. No. 100-203, Title IX Sec. 9342(b), 101 Stat. 1330, 1330-371 (1987). We apply the prior version because the reports on which defendants rely to trigger the running of limitations were filed before the effective date of the amendment. See, e.g., Martin v. Murphy, 815 F.Supp. 1451, 1453 (S.D.Fla.1993) (holding pre-amendment version of statute applies to pre-December 31, 1987 reports); Anderson v. Mortell, 722 F.Supp. 462, 468 n. 3 (N.D.Ill.1989) (same). Moreover, neither the defendants nor the Secretary contends amended Sec. 1113 applies.
 
 
 [21]
 There are actually multiple Schedules A attached to the 1983 Form 5500. For clarity, we will refer to Schedule A in the singular, as have defendants
 
 
 [22]
 Defendants refer in this portion of their brief both to the Secretary's complaint and to his first amended complaint. The allegations of the complaint on which defendants base their argument are essentially the same in both documents, although the paragraphs have been renumbered and the amended complaint contains changes that are not germane to the present appeal. We will refer simply to the Secretary's "complaint" unless the context otherwise requires
 
 
 [23]
 In his brief the Secretary advanced the same argument. See Appellee Br. at 48 (arguing that even if this court agreed with defendants, "only the Secretary's cause of action for the 1983 GILICO policies would be barred by the three year statute of limitations")
 
 
 [24]
 In denying defendants' partial summary judgment motion, the trial court held there were genuine issues of material fact concerning fraudulent concealment and actual or constructive knowledge
 
 
 [25]
 Defendants have argued, of course, that comparable term insurance was never available